UNITED STATES of America

v.

Forrest PARROTT, Donald Parrott, John V. Holmes, Durward E. Willis, Harry Kaskowitz.

Crim. No. 830-64.

United States District Court District of Columbia.

Dec. 6, 1965.

————◆————

Edward J. Barnes, Sp. Asst. U. S. Atty., Washington, D. C., for the United States; David B. Bliss, Securities and Exchange Commission, Washington, D. C., of counsel.

Murray A. Kivitz and F. Joseph Donohue, Washington, D. C., for defendants Forrest Parrott and Donald Parrott.

Delmar W. Holloman and John Henry Brebbia, Washington, D. C., for defendant Holmes.

Lawrence J. Bernard, Jr., Washington, D. C., for defendant Willis.

Sol Zael Rosen, Washington, D. C., for defendant Kaskowitz.

GASCH, District Judge.

Motions to dismiss this twenty-count indictment, as well as motions to suppress and to sever certain defendants, are before the Court following the filing of extensive memoranda, affidavits, and proffers of proof respecting witnesses said to be no longer available. From this material it appears that the facts are as follows:

The indictment alleges that from about February 1, 1960, and continuing to the date of the indictment, September 10, 1964, these defendants did commit certain acts in violation of the criminal provisions of the Securities and Exchange Act[1] and did also conspire to violate this Act.[2] The investigation which culminated in this indictment began on or about August 28, 1961, when defendant Holmes was examined by agents of the Securities and Exchange Commission (SEC) concerning his relationship with Hydramotive Corporation. On September 1, 1961, the SEC issued a formal order of investigation into the matter of Hydramotive Corporation, and obtained records and papers in the possession of defendants Donald Parrott and Durward E. Willis.[3] In the following months several of the defendants were subpoenaed and testified before SEC representatives and produced records relating to the matter under investigation.[4]

On December 13, 1961, the SEC sought a temporary restraining order and preliminary and permanent injunctions in the United States District Court for the Western District of Oklahoma. In the interim, defendants offered to escrow their Hydramotive stock. After perpetuation of the preliminary injunctions by the consent of the defendants, the SEC obtained a permanent injunction on December 30, 1963.[5] The following defendants indicted in the instant criminal case were also parties defendant in the Oklahoma civil action: Forrest Parrott, Donald Parrott, John V. Holmes, Durward E. Willis, Jules Arfield, and Robert

1. Title 15 U.S.C. § 77q(a).

2. Title 18 U.S.C. § 371.

3. These papers and records pertained not only to Hydramotive Corporation, but also to other corporations, notably, Hydramotive's predecessor, Cal Moab Uranium Company. It appears that Donald Parrott and Willis produced such papers and records on threat of having them subpoenaed. They were uncounseled at this time. The absence of counsel militates against any conclusion that they might have waived their constitutional rights.

Greenwell v. United States, 119 U.S.App. D.C. 43, 49, 336 F.2d 962, 968.

4. There is conflicting testimony as to whether the defendants were warned of their right to counsel and right to refrain from self-incrimination. It appears that at least on some occasions they were so warned. It is not necessary to resolve this conflict in the disposition of this case.

5. S.E.C. v. Bond & Share Corp., 229 F. Supp. 88 (W.D. Okl.).

L. Allen.[6] The trial of the injunctive action commenced on July 15, 1963, and consumed five days, at which defendants Donald Parrott, Forrest Parrott, Willis and Holmes testified fully as adverse Government witnesses. Several depositions were taken in preparation of this trial both of and by the defendants. It is significant that at this trial defendants were not informed of the fact that the SEC had recommended criminal prosecution, nor were they warned of their constitutional rights against self-incrimination.

The recommendation of criminal prosecution occurred on or about November 13, 1962, when the SEC criminal reference report was forwarded to the United States Attorney for the District of Columbia. This report lay in an inactive status for approximately one year until it was reassigned to present Government counsel. In the early Spring of 1964, present Government counsel began to devote his attention to the matter. The case was presented to the grand jury in August, 1964; on September 10, 1964, the indictment was returned.

Another civil proceeding involving some of the present defendants concerns this Court. On August 8, 1962, the SEC initiated broker-dealer revocation proceedings against one of the brokers who sold Hydramotive stock on the open market. Defendant Forrest Parrott was named as a "probable cause" for the revocation. After several court proceedings involving the question of whether they could be compelled to appear at these revocation proceedings in Washington, the Parrotts testified in early June, 1964. Present Government counsel attended the hearing and listened to the Parrotts' testimony; his identity was purposefully concealed.[7] In connection with these same proceedings, a more significant action on the part of the Government is

noteworthy. The SEC attorney denied that criminal proceedings had been instituted against any of the persons involved.[8] This denial appeared in the transcript of the proceedings and preceded the testimony of the Parrotts.

In summation, the SEC initiated civil and administrative proceedings against some of the defendants herein. Although the defendants received general warnings at *some* of these proceedings, at no time were they informed of the fact that the matter had been referred to the U. S. Attorney's Office for criminal prosecution.

Two separate but related principles of law are involved in the consideration of these motions. First: May the Government by bringing a parallel civil proceeding avail itself of the almost unlimited opportunity that a civil litigant has to take extensive depositions of the other party to the civil proceeding and then utilize the fruits of this interrogation, as well as seizures without a warrant of books and records of certain of these defendants, in the preparation of the criminal case? Second: Is the delay which occurred between the discovery of this alleged scheme to defraud and the bringing of the indictment in violation of the Sixth Amendment right to a speedy trial or Rule 48(b) of the Federal Rules of Criminal Procedure?

██ With respect to the first point, the Court recalls that the Supreme Court has made it clear that Federal courts do have supervisory authority (see Rule 41 (e)) over the manner in which Federal agents exercise their powers.[9] A defendant charged with a crime may seek an injunction to prevent civil proceedings if his testimony at those proceedings would disclose evidence which might be used against him at the criminal trial.[10] The theory which underlies the granting of such an injunction is the recognition

---

6. Defendants Harry Kaskowitz, Harry Weintraub and Allen R. Rose were not parties to the Oklahoma suit.

7. See Appendix A of this opinion.

8. See Appendix B of this opinion.

9. Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233.

10. Silver v. McCamey, 95 U.S.App.D.C. 318, 221 F.2d 873.

"that due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him. *His necessary defense in the administrative hearing may disclose his evidence long in advance of his criminal trial and prejudice his defense in that trial.*" [11]

In the *Silver* case, petitioner was aware of the pending criminal action, whereas in the instant case, defendants were not. However, the Court is of the opinion that the danger of prejudice flowing from testimony out of a defendant's mouth at a civil proceeding is even more acute when he is unaware of the pending criminal charge. It should be remembered that some of the defendants herein testified freely at the Oklahoma civil action without the benefit of warning or knowledge of the fact that the very matters that they were testifying to were contained in a criminal reference report in the hands of the U. S. Attorney. [12]

The instant case is not unlike *Nelson v. United States*. [13] Nelson, who was believed to have extensive gambling interests in this area, was called before a congressional committee and directed to turn over to that committee certain papers and records. He was uncounseled and unwarned; he subsequently produced the requested materials. Thereafter he was indicted, the records and papers having been forwarded to the U. S. Attorney's Office by the committee. These papers were introduced in evidence, and he was convicted in a criminal prosecution, which was subsequently reversed by the Court of Appeals. The Court of Appeals found that Nelson's constitutional rights had been violated and that the evidence so obtained should not have been used at all. [14] The defendants in the instant case, as did Nelson, produced records and gave testimony in proceedings at which they were often without counsel and often not warned of their constitutional rights. [15]

In *Smith v. Katzenbach*, [16] a recent decision in this circuit, the Court of Appeals discussed a number of cases which are helpful to the resolution of this controversy. In *Smith*, Internal Revenue agents first sought to make an audit of petitioner's books, records and papers. Subsequently, special agents, whose responsibilities were in the criminal field, entered the investigation. Although the Court of Appeals was not required to resolve the difficult issue arising from the participation of the criminal investigators, Judge Leventhal observed

"that if evidence is taken by Government officials in violation of a person's rights under either the Fourth Amendment or the Fifth Amendment, he is entitled to institute proceedings to restrain the use of the evidence against him, and to do so in anticipation of the indictment, by restraining presentation to the grand jury, without being subject to the objection of prematurity." [17]

Naturally, before such proceedings can be initiated the petitioner must know that the matter is about to be presented to the grand jury. However, such lack of knowledge need not result in a complete lack of remedy, for courts have granted motions to suppress when the discovery was not made until after the indictment had been returned.

---

11. 95 U.S.App.D.C. at 320, 221 F.2d at 874–875. (Emphasis supplied.)

12. Defendants Willis and Holmes appeared and testified without the benefit of counsel.

13. 93 U.S.App.D.C. 14, 208 F.2d 505.

14. 93 U.S.App.D.C. at 24, 208 F.2d at 515.

15. The lack of warning is particularly important with regard to the testimony of some of the defendants in the Oklahoma action.

16. 122 U.S.App.D.C. ——, 351 F.2d 810, decided September 3, 1965.

17. 351 F.2d at 815. Citing with approval Judge Sobeloff's opinion in Austin v. United States, 297 F.2d 356 (4th Cir.). See, also Lord v. Kelley, 223 F.Supp. 684 (D. Mass.); Rea v. United States, supra.

In *United States v. Lipshitz,*[18] defendant moved to suppress certain materials which he had voluntarily relinquished to Internal Revenue agents under the mistaken assumption that those agents were merely concerned with civil proceedings. The agents had not informed the defendant of the criminal investigation which was being conducted, nor did they warn him of his constitutional rights. The District Judge granted the motion to suppress relying upon *United States v. Guerrina,*[19] where Judge Clary observed:

"I can see no difference between a search conducted after entrance has been gained by stealth or in the guise of a business call, and a search for criminal purposes conducted under the guise of an examination for purely civil purposes."[20]

When a witness under investigation is subpoenaed to testify in a civil proceeding, oftentimes the witness is forced "to choose among the three horns of the triceratops—harmful disclosure, contempt, perjury."[21] In *United States v. Thayer,*[22] the defendant was convicted of having made the last choice, namely, perjury. Defendant had testified before an initial SEC investigation concerning his relationship to a corporation under inquiry. The SEC had reason to believe that he testified falsely. Subsequently, he was subpoenaed again and a second "deposition" was taken. Defendant was uncounseled, but he did receive the standard warnings. His testimony at this "deposition" was received into evidence at the criminal trial. The questions propounded at the second confrontation were wide in scope, but interspersed among them were specific inquiries as to his former testimony. The trial court held that

"[T]he giving of the warning can not have much significance where the defendant was, so to speak, then within the sights of the Government and did not receive an explanation of the true import of the second inquiry."[23]

Apart from any issue of self-incrimination, the trial court was concerned with considerations of justice and fair play. The circumstances surrounding the taking of defendant's testimony were such as to require a careful investigation into the degree of taint attached to such testimony because of the procedures utilized by the SEC.

"While the proceedings before the Securities and Exchange Commission are not now being *condemned,* at the same time the hazard of unfairness is being recognized, and where even such a hazard exists the conviction cannot be approved."[24]

The trial court ordered a new trial to determine the propriety of receiving the evidence taken at the second deposition.

The antitrust field also provides support for the proposition that parallel civil and criminal inquiries should not be commingled. In *United States v. Cigarette Merchandisers Association,*[25] the District Court held in abeyance defendants' motion to take depositions in the civil case until the criminal case was disposed of.[26] In the instant case, these defendants are confronted with a situation in which they had no notice that the

18. 132 F.Supp. 519 (E.D.N.Y.).

19. 112 F.Supp. 126 (D.C.E.D.Pa.).

20. 112 F.Supp. at 129. See also Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319.

21. VIII Wigmore on Evidence, McNaughton Revision, § 2251.

22. 214 F.Supp. 929 (D. Colo.).

23. 214 F.Supp. at 933.

24. 214 F.Supp. at 933–934 (emphasis in original).

25. 18 F.R.D. 497 (S.D.N.Y.).

26. See also United States v. A. B. Dick Co., 7 F.R.D. 442 (N.D.Ohio); United States v. Linen Supply Institute, 18 F.R.D. 452 (S.D.N.Y.); United States v. Maine Lobstermen's Ass'n, 22 F.R.D. 199 (D.Me.).

Government would subsequently bring an indictment against them. It seems clear that the teaching of *Silver* is in line with the theory underlying the *Cigarette Merchandisers* case, namely, that the criminal matter should first be disposed of, certainly prior to the taking of civil depositions. This proposition is much clearer in the instant case wherein the Government has not only seized evidence belonging to these defendants—some of it without search warrants—but has also taken extensive depositions and testimony in conjunction with the civil case. It should also be noted that whatever obligation the Government had to protect the public by injunction was not disputed or opposed by these defendants, for they offered to escrow their stock and consented to the maintenance of the *status quo* by agreeing to the continuance of preliminary injunctions.

■ The Court holds that the Government may not bring a parallel civil proceeding and avail itself of civil discovery devices to obtain evidence for subsequent criminal prosecution. On the basis of this holding, the Court would have been disposed to decide the degree to which the tainted evidence was a basis for the entire criminal prosecution,[27] or to grant appropriate motions to suppress. However, the long delay of the Government in returning the indictment, a delay aggravated by the Government's conduct described above, affords an appropriate basis under these circumstances for dismissing the indictment as to all of the defendants.

■ The facts and circumstances of each particular case determine the applicability of the Sixth Amendment.[28]

"The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." [29]

■ There are four factors in a speedy trial consideration which appear to be crucial: (1) time involved; (2) who caused the delay; (3) the purposeful aspect of the delay; and (4) prejudice to the defendant.[30]

[8] The time factor is necessarily determined by the point at which the computation begins. In some circuits, the computation of time does not begin until a formal complaint or indictment has been filed.[31] However, this is not universally true. In this circuit, there are a number of cases in which our Court of Appeals has recognized

"[T]he constitutional guarantee protects against undue delays in presenting a formal charge as well as delays between indictment and trial." [32]

A determination of whether the Sixth Amendment has been violated necessitates a consideration of the entire period between offense and eventual trial. In the instant case, the time period which can be considered as constituting the delay could begin with the date of the first overt act in the indictment. More logically, however, the computation should begin with the date on which the

27. United States v. Thayer, supra; Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441.

28. Taylor v. United States, 99 U.S.App. D.C. 183, 186, 238 F.2d 259, 262.

29. Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950.

30. United States ex rel. Von Cseh v. Fay, 313 F.2d 620, 623 (2d Cir.).

31. Parker v. United States, 252 F.2d 680 (6th Cir.), cert. denied, 356 U.S. 964, 78 S.Ct. 1003, 2 L.Ed.2d 1071; Harlow v.

United States, 301 F.2d 361 (5th Cir.); Foley v. United States, 290 F.2d 562 (8th Cir.); D'Aquino v. United States, 192 F.2d 338 (9th Cir.).

32. Mann v. United States, 113 U.S.App. D.C. 27, 29–30, n. 4, 304 F.2d 394, 396–397, n. 4. See also Taylor v. United States, supra; Powell v. United States, 122 U.S.App.D.C. ——, 352 F.2d 705, decided August 30, 1965; Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808; Ross v. United States, 121 U.S.App. D.C. 233, 349 F.2d 210.

Government considered the defendants' actions to be "criminal." This date would be November 13, 1962, when the SEC criminal reference report was referred to the United States Attorney. Thus, the delay involved is at least approximately twenty-two months.[33]

The cause of the delay appears to be uncertain. Initially, it was occasioned by what must be termed as inaction amounting to negligence in the Prosecutor's Office. The case lay for more than one year without effectual attention. In November, 1963, it was assigned to present Government counsel and in the early Spring of 1964 he began to devote his attention to it. All the while, and continuing through the month before the case was presented to the grand jury, civil and administrative proceedings were in progress at which the defendants were testifying fully. These facts are also relevant with respect to the issue of whether or not the delay could be considered "purposeful."

■ "The delay must not be purposeful or oppressive." [34] There is no absolute test as to what constitutes purposeful delay. Bad faith or chicanery on the part of the Government is not a necessary element. It is enough if the Government has made "a deliberate choice for a supposed advantage, which caused as much oppressive delay and damage to the defendant as it would have caused if it had been made in bad faith." [35] In the instant case, it appears that the Government has made a deliberate choice to hold the criminal prosecution in abeyance. As a result of that choice, delay has ensued and the fruits of the civil proceedings have undoubtedly aided the Government with respect to the criminal prosecution. Conversely, the choice has damaged and prejudiced the defendants.

■ The element of prejudice has recently received much consideration in this jurisdiction.[36] Where the delay is substantial, prejudice may be presumed and the Government bears the burden of showing that no prejudice has resulted.[37] The Court may consider the fact of indigency of the accused.

> "Because of the impoverished state of eighteen of the defendants, they were represented by counsel not of their own choice, but assigned by the Court to serve without compensation. As in all long-delayed cases, the witnesses now are scattered; some are not accessible, more particularly to the defendants who are without funds; the memories of witnesses as to events occurring many years ago are not clear. It is for these reasons among others that the Constitution of the United States requires a speedy trial * * *." [38]

In *Hanrahan v. United States*,[39] the Court of Appeals was faced with a three and one-half years' delay, which is closely analogous to the instant case. In *Hanrahan*, the defendants were indicted in Puerto Rico on July 22, 1959.[40] They

---

33. No delays after the return of the indictment can be charged to the Government for the purpose of this motion. In fact, the defendants requested continuances on several occasions.

34. Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 486, 1 L.Ed.2d 393.

35. Petition of Provoo, 17 F.R.D. 183, 202 (D.Md.), aff'd 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761.

36. Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210; Mackey v. United States, 122 U.S.App.D.C. ——, 351 F.2d 794, decided June 30, 1965; Cannady v. United States, 122 U.S.App.D.C. ——, 351 F.2d 817, decided July 14, 1965; Bey v. United States, 121 U.S.App.D.C. 337, 350

F.2d 467; Powell v. United States, supra; Jackson v. United States, 122 U.S.App. D.C., ——, 351 F.2d 821, No. 18,597, decided September 13, 1965; Worthy v. United States, 122 U.S.App.D.C. ——, 352 F.2d 718, decided October 7, 1965.

37. Williams v. United States, 102 U.S.App. D.C. 51, 250 F.2d 19.

38. United States v. McWilliams, 82 U.S. App.D.C. 259, 260, 163 F.2d 695, 696 (quoting with approval lower court opinion).

39. 121 U.S.App.D.C. 134, 348 F.2d 363.

40. Unlike the facts in Provoo, supra, the Government in Hanrahan did not choose a questionable or doubtful forum in Puerto Rico.

filed a change of venue motion, which was granted, and the case was transferred to the District of Columbia. On account of the fact that many Government witnesses spoke no English, the Government dismissed the Puerto Rican indictment. Approximately seventeen months later, after an extensive reinvestigation, the Government brought a second indictment and the case was tried approximately three and one-half years after the original indictment in Puerto Rico was brought. The defendants were convicted, but the Court of Appeals remanded the case for further proceedings to determine two questions: First, did the prosecutor exercise reasonable diligence in seeking the second indictment? Second, if no constitutional violation is found, was there unnecessary delay under Rule 48 (b) whereby the trial court in its discretion should dismiss the indictment? As to the first question, if the delay was the result of deliberate or at least negligent actions by the Government and no reasonable explanation is forthcoming, the defendants' Sixth Amendment rights have been denied. As to the second question, in exercising its discretion the trial court should "consider the prejudice resulting from possible loss of evidence as well as the hardships appellants might have suffered by reason of the delay in the prosecution." [41] The Court in the instant case has considered both questions and concludes that the indictment should be dismissed.

The Government has not adequately justified the delay. As to the twenty-two months' delay wherein the matter was in the hands of the United States Attorney, the only excuse that the Government has tendered is the pressure of work in the U. S. Attorney's Office. When the matter was finally assigned to present counsel, approximately one year after it was received from the SEC, his affidavit reflects that he, too, was unable to give the matter his attention until the late Winter or early Spring of 1964, and then only on a part-time basis. Commendably, he was able to present the matter before the grand jury in less than six months. No explanation is made as to why the services of such counsel could not sooner have been obtained. Significantly, during the period of non-action, the Government was continuing to take the depositions and to obtain the testimony of certain of these defendants.

Counsel for the defendants herein have filed a consolidated proffer as to prospective witnesses for the defense who are no longer available by reason of death or serious illness.[42] The Government has filed objections to the proffer and has furnished the Court with certain depositions covering testimony of some of the unavailable witnesses. The Court has endeavored to compare these depositions with the proffer in order to determine the factual accuracy of the proffer and whether or not they would be an adequate substitute for the testimony of unavailable witnesses.

▮ Some of the witnesses described in the proffer died or became otherwise unavailable before any realistic trial date.[43] Furthermore, the proffer was overly optimistic in some respects, notably, the amount of actual knowledge possessed by the unavailable witnesses as to the details of Hydramotive Corporation. The depositions, however, do reflect one very important element. The unavailable witnesses, particularly Ward Heidenrich, an attorney, probably would have testified that they believed defendants to be engaged in a lawful enterprise and that their actions were made in good faith. Such testimony would have been of critical importance at the criminal trial.[44]

---

41. 121 U.S.App.D.C. at 139, 348 F.2d at 368 (footnotes omitted).

42. The proffer is attached as Appendix C.

43. Prospective witnesses Robert L. Allen, Simon F Peavey, Jr., and Baldwin Bane fall within this category.

44. In a prosecution under the Securities Act, intent to defraud is an essential element of the offense. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L. Ed. 709; United States v. Vandersee, 279 F.2d 176, 179 (3rd Cir.).

Additionally, Heidenrich and another prospective witness, Harry Snook, would have undoubtedly given favorable character testimony on behalf of defendants Willis and Holmes, respectively.[45] The Court, therefore, finds that the depositions would not be an adequate substitute for such testimony. When the Government's delay has stripped the defense of valuable witnesses, it cannot be said that defendants were not prejudiced.

The proffer also states that George H. Slack was knowledgeable as to the affairs of Hydramotive, particularly with reference to the acquisition of Hoppers, Inc., a small chemical corporation. The proffer further states that the prospects of Hoppers were good and that Hoppers received $5,000.00 from Hydramotive Corporation to be used in connection with Hoppers' production. That sum was, in fact, paid, but its use was confined to the paying of Hoppers' expenses. Slack was President of Hydramotive and relied upon Willis considerably; his testimony may have benefited defendants. Although available witnesses might be capable of testifying to many of the same facts, the instant case could be analogized to the situation facing Provoo wherein certain officers, notably General Wainwright, were unavailable. Judge Thomsen found prejudice in such a situation.[46]

According to the proffer, another witness, Robert W. Johnson, would have testified that he examined the automobile designs of Hydramotive and considered the new innovations reflected therein to be feasible and practicable. Although other experts are certainly available, the fact that Johnson communicated his conclusions to the officers of Hydramotive would make his testimony unique in that respect. There are no depositions of Johnson available. Thus, the Court need only determine whether the loss of the proffered testimony has prejudiced the defendants. Realizing that all of the proffered testimony might not reasonably be expected of this witness, the Court, nevertheless, finds that his unavailability has resulted in prejudice.

Two other unavailable witnesses, Jack Farrell and Joseph Shernov, were stockbrokers who traded Hydramotive stock. Although the Government is undoubtedly correct when it contends that there are other brokers available who could testify as to the marketing of Hydramotive stock, the Court is not unmindful of the fact that the Government's unjustified delay has limited the defendants' choice of witnesses. It may well be that other satisfactory witnesses are available, but it is not the Government's prerogative to select which witnesses the defense can or cannot call, and when the Government's delay produces a result that amounts to such selection, the Court will consider the defendants to have been prejudiced.

In *United States v. Kane*,[47] defendants moved to dismiss the indictment on the ground of "abuse of process." As in this case, defendants were charged with violations of the securities laws. The indictment was not returned until shortly before the Statute of Limitations had expired. The claim of "abuse of process" was treated by the Court as a motion to dismiss on the ground of denial of defendant's right to a speedy trial. Judge Weinfeld declined to dismiss the indictment for the reason that

> "There is no showing here that the delay was 'purposeful or oppressive,' or even that defendants have been prejudiced. Indeed, it appears that the Government's case is largely doc-

---

45. It should be noted that, as to Heidenrich's testimony, the most useful deposition has not been made available to the defense. Speaking of defendant Willis, Heidenrich testified as follows:
   "I think if anything untoward has happened or transpired, that it was unwitting, *that it wasn't with the thought in mind of violating any law or state or Federal on his part or at his direction or consent,* and that he is a veritable genius in so far as engineering matters are concerned * * *." (Emphasis supplied).

46. 17 F.R.D. at 203.

47. 243 F.Supp. 746 (S.D.N.Y.).

umentary, *that important witnesses are available*, and that defendant's recollection of events has not dimmed." [48]

Significantly, the judge denied the motion to dismiss without prejudice to its renewal upon the trial where defendants might be able to show that they were prejudiced by the delay.[49]

Unlike the situation in *Kane,* the evidence in this case is not largely documentary, important witnesses have become unavailable, and the recollection of events by witnesses and defendants has dimmed.[50]

The Court finds that the delay in the instant case was the result of inaction amounting to negligence in the U. S. Attorney's Office and that no adequate explanation of that delay has been forthcoming. The Court further finds that the defendants have been prejudiced by the loss of prospective witnesses and the inability of some of the witnesses to remember certain facts and details by reason of the delay.

In reaching the conclusion to dismiss the indictment, the Court has taken into consideration the manner in which the Government gave priority to the civil action over the criminal action. In so doing the Government availed itself of the extensive discovery procedures available to civil litigants. While it cannot be said that this was the motivating purpose of the delay in prosecuting the criminal case, nevertheless, the Government has utilized the fruits of the depositions and other testimony taken in the civil action and the administrative broker-dealer revocation proceedings in the criminal case.

The right to a speedy trial is necessarily relative,[51] and involves a combination of circumstances against which the actions of the Government must be evaluated.[52] Here, civil and criminal cases involving basically the same issue were commingled. Preference was given the civil case. This required the defendants to disclose their defense long in advance of the indictment.[53] Of equal importance is the fact that the defendants have through the death and illness of certain of the witnesses, on whose testimony they would have relied, been materially prejudiced.[54] This warrants the Court in exercising its discretion under Rule 48(b) and dismissing the indictment.[55]

In this view of the case, it is not necessary to reach the search and seizure issues under the Fourth Amendment, the due process issues under the Fifth Amendment,[56] or the Sixth Amendment speedy trial issues. Were it necessary to reach these constitutional questions, the result would be the same for these defendants have been denied substantial constitutional rights guaranteed under these Amendments.

The indictment is dismissed. Counsel will prepare an appropriate order.

## APPENDIX A

Mr. Kivitz: Mr. Examiner, as long as counsel for the staff is going to confer

---

48. 243 F.Supp. at 754 (footnotes omitted), (emphasis supplied).

49. Citing United States v. Hunter Pharmacy, Inc., 213 F.Supp. 323 (S.D.N.Y.).

50. At the hearing on this motion defense counsel read several portions of the transcript of the Oklahoma civil action wherein witnesses testified that they could not remember certain facts. Hearing Tr. 52–53.

51. Beavers v. Haubert, supra.

52. Taylor v. United States, supra; United States v. McWilliams, supra; Williams v. United States, supra.

53. Silver v. McCamey, supra.

54. "Finally, they seek to insure that the ability of the accused person to answer the charge will not be impaired on account of lost witnesses and faded memories due to the passage of time."
Hanrahan v. United States, supra, 348 F. 2d at 367 (footnotes omitted).

55. Nickens v. United States, supra.

56. Powell v. United States, supra.

with parties present, I think counsel for respondent is entitled to know with whom they are conferring. If these people appear here as mere spectators then the cause for conversation between them would not be opportune. If they appear here—

Mr. Bliss: The gentleman I conferred with is Mr. Mahlon Frankhouse.

Mr. Kivitz: The other gentleman was whom?

Mr. Bliss: I haven't said.

Mr. Kivitz: I don't see what the big secret is.

Hearing Examiner Swift: That application is denied.

Mr. Kivitz: If they are going to confer I request he be present at the counsel table.

Hearing Examiner Swift: Well, he is not present at table occupied by counsel and he hasn't been at all this morning.

Mr. Kivitz: But there still has been conferences between them.

Hearing Examiner Swift: We'll have no further argument from you on this. I've denied your present application.

Mr. Kivitz: Note my exception.

## APPENDIX B

### ALFRED BREHMER

was called as a witness by the Division and, having been first duly sworn, was examined and testified as follows:

Hearing Examiner Swift: Please take the stand Mr. Brehmer. Have you counsel representing you in this matter?

The Witness: No, I wish I did have but I couldn't afford to pay for a fare out here and the counsel's advice, so I had to be here without counsel.

Hearing Examiner Swift: In view of that situation which you have just described I think I as the Hearing Examiner should inform you that if any question is propounded to you that you think violates your constitutional rights, that it subjects you to a fine or forfeiture, or tends to degrade you, that you will make your apprehension along the line known

to me and I will rule on the situation, if anything like that develops.

I think I should advise you as to that in view of the fact you have no counsel here representing you this morning.

Proceed, Mr. Hyman.

Mr. Bliss: Mr. Swift, may I add to your remarks for the information of Mr. Brehmer that the privilege of the Fifth Amendment is his and he may refuse to answer any question put to him if he so desires. It is his determination whether or not to answer a particular question; that will prevail.

Hearing Examiner Swift: Mr. Bliss I'm glad you made those clarifying remarks and I agree with you.

Mr. Bliss: Just so you understand Mr. Brehmer.

The Witness: Yes.

### DIRECT EXAMINATION

By Mr. Hyman:

Q Do I understand you wish to proceed without an attorney this morning?

A That is right, sir.

Mr. Prem: The Division has not instituted any criminal proceedings against any of the persons—

Mr. Bliss: *No.* We do give them constitutional warning, as we say, so the witness may be informed.

Hearing Examiner Swift: That's my practice in all situations like this, Mr. Prem.

Now proceed with the examination.

## APPENDIX C

### CONSOLIDATED PROFFER OF PROOF

The defendants Forrest Parrott, Donald Parrott, John V. Holmes, Durward E. Willis and Harry Kaskowitz claim their defense to this action has been prejudiced by the Government's unjustified lengthy delay in initiating this prosecution in that witnesses favorable to the defense are not now available to testify. This proffer is based upon the best knowledge, information and belief of the defendants collectively and depositions of Robert L.

Allen, dated October 9, 1962, Ward Heidenrich, dated June 25, 1963, Harry Snook, dated July 9, 1962, and George H. Slack, dated June 25, 1963, which were made available to the defendants by Special Assistant United States Attorney Edward Barnes. It must be noted, however, that in response to questioning by defense counsel, Mr. Barnes indicated that he had in his possession additional affidavits and depositions of some of the witnesses listed below, but that upon request, Mr. Barnes refused to make these documents available to the defendants. The following proffer of proof setting forth the defendants' belief as to why witnesses are not available and what such witnesses would have testified was prepared without the benefit of the additional materials:

1. WARD HEIDENRICH, who died in late 1964, would have testified as follows:

a. He was a graduate of the University of Wisconsin and the De Paul Law School.

b. He was admitted to the Bar of the State of Illinois in 1922 and was in active practice of law since that time.

c. He was an Assistant Attorney General for the State of Illinois.

d. He was Secretary and Director of Hydramotive Corporation from June 1961 to May 1962.

e. He attended all meetings of the Board of Directors of the Hydramotive Corporation (three or four meetings) during the period he was an officer and prepared the minutes of all such meetings.

f. He was familiar with the corporate actions of Hydramotive Corporation during the term of his office which actions included arrangements with Hoppers, Inc., Hydramotive Manufacturing Corporation and Solo Tire Company, all of which were referred to in the indictment.

g. He believed the arrangements made with Hoppers, Inc., Hydramotive Manufacturing Corporation and Solo Tire Company would generate income to the Hydramotive Corporation, were ad-vantageous to the stockholders of the Hydramotive Corporation, were legal and proper and were not intended to be a part of any sham or fraud as alleged in the indictment.

h. That Hydramotive Corporation paid $5,000.00 to Hoppers, Inc. for purposes of extending working capital to Hoppers, Inc. and to secure an agreement to purchase a 50 percent interest in Hoppers, Inc.

i. He resigned from Hydramotive Corporation because of the demands his private law practice made upon his time.

j. He did not know the defendants Forrest Parrott and Donald Parrott.

2. GEORGE H. SLACK, who had a frontal lobal lobectomy in late 1963 and is thereby incapacitated, would have testified as follows:

a. He was a graduate pharmacist.

b. He was active in industrial chemical development and manufacturing for many years.

c. He was president of Hoppers, Inc., a chemical manufacturing firm organized in the State of Indiana.

d. He was president and a director of the Hydramotive Corporation from June 1961 to May 1962.

e. That Hoppers, Inc. held patents for several valuable industrial chemical products.

f. That one product produced by Hoppers, Inc. was used by the United States Steel Corporation and that additional corporations, including Indiana Steel and the Chrysler Corporation were interested in this and other products manufactured by Hoppers, Inc.

g. The prospects of Hoppers, Inc. were good, but required working capital to expand production and to generate profits.

h. He was familiar with the arrangements for the purchase of 50 percent of Hoppers, Inc. by the Hydramotive Corporation.

i. That the sale of 50 percent of Hoppers, Inc. to the Hydramotive Corpora-

tion was intended to raise working capital for Hoppers, Inc.

j. That Hoppers, Inc. received $5,000.00 from the Hydramotive Corporation for working capital.

k. That he prepared and presented a report to the officers of Hydramotive Corporation outlining the products patented and being manufactured by Hoppers, Inc.

l. That the aforesaid report was accurate.

m. That the defendants never interfered with nor exercised influence upon the officers of Hydramotive Corporation.

n. He did not know the defendants Forrest Parrott and Donald Parrott.

3. ROBERT L. ALLEN, who died in May 1963, would have testified as follows:

a. He received a Bachelor of Science and a Master of Arts degree in Mechanical Engineering from George Institute of Technology.

b. He received a degree in Education from Southern Illinois University.

c. From 1932 he was a Professor of Mechanical Engineering at Georgia Institute of Technology.

d. Early in 1962 he had been contacted by officials of the Dublin, Georgia Chamber of Commerce who sought his expert opinion on the feasibility of certain automotive designs.

e. Subsequently, he met with the representatives of the Dublin Chamber of Commerce and examined and discussed the plans in detail with the automobile's designer, Durward E. Willis.

f. That he advised the Dublin group that it was his opinion the plans were feasible and that certain design innovations, specifically the hydraulic transmission and the fuel injection system, had special merit.

g. That he advised the representatives of the Dublin Chamber of Commerce that Mr. Willis was a knowledgeable designer.

h. That on June 1, 1961 in response to an inquiry from Mr. Bert Robbins who was considering arranging financing for Mr. Willis's automobile designs, he wrote the following:

"There is no question in my mind that Mr. Willis is a competent engineer. A good job has been done in working out the designs, in fact, I believe that many of his ideas had considerable merit."

i. The automobile designs he reviewed in June 1961 are the same designs subsequently used by Hydramotive Manufacturing Corporation and are the subject of this indictment.

j. He believes the Hydramotive Manufacturing Corporation designs are feasible and that there is no reason to believe that they will not be successful.

k. That many of the statements alleged in the indictment to be misleading are not misleading and that some of the facts alleged to be concealed were not material.

l. That he has examined the report prepared by Mr. Frank Acton and that he does agree with Mr. Acton's findings.

4. ROBERT W. JOHNSON, who died in 1964, would have testified as follows:

a. He is an experienced hydraulic engineer.

b. He examined the automobile designs of Hydramotive Manufacturing Corporation and believes the designs and new innovations reflected in such designs are feasible and practicable.

c. He reported his findings to the officers of the Hydramotive Corporation.

5. HARRY SNOOK, who died in late 1963, would have testified as follows:

a. He was business editor of the Charlottesville Observer.

b. He wrote the promotion stories which the indictment alleges the defendants promoted.

c. That no story he wrote regarding Hydramotive Manufacturing Corporation or the Hydramotive Corporation or any of their business arrangements were in

any way solicited or promoted by any of the defendants.

d. That his interest in the Hydramotive Manufacturing Corporation and its financial prospects was initiated when he learned that the corporation had been incorporated in the state.

e. That of his own initiative he sought out representatives of the Hydramotive Manufacturing Corporation to determine the nature of their business.

f. That he independently confirmed the facts told to him by representatives of Hydramotive Manufacturing Corporation and found these facts to be accurate.

g. That specifically he made inquiries with the Georgia Tool Company which confirmed that Georgia Tool was fabricating automobile parts for a model automobile for the Hydramotive Manufacturing Corporation and, further, that the Hydramotive Manufacturing Corporation did have an agreement to purchase the Georgia Tool Company.

h. That he does not know the defendants Forrest Parrott and Donald Parrott.

6. SIMON F. PEAVEY, JR., who died on March 18, 1963, would have testified as follows:

a. He received a B.A. and LL.B. degree from Harvard University.

b. He was a member of the Bar of the State of New York and engaged in active practice for over forty years.

c. He was familiar with all aspects of the affairs of Cal Moab Uranium Corporation, later known as Hydramotive Corporation.

d. He held shares of Cal Moab.

e. He advised Mr. Forrest Parrott to place all his shares in escrow prior to June 1961 and had reviewed the escrow agreement which in fact divested Mr. Parrott of all authority to vote his shares of Cal Moab prior to the June stockholders' meeting of the Cal Moab Uranium Corporation.

f. That he was familiar with Oklahoma corporate laws and by virtue of his familiarity with the affairs of Cal Moab knew that Donald and Forrest Parrott did not control the actions of Cal Moab, later known as Hydramotive Corporation, as alleged in the indictment.

g. That he knew that Cal Moab had issued 1,000,000 shares of stock which were tradable to the public pursuant to Securities and Exchange Commission Regulation "A".

h. That he was familiar with SEC rules and regulations and had advised Donald and Forrest Parrott that they could lawfully sell those shares of Cal Moab which had originally been issued pursuant to SEC Regulation "A".

7. BALDWIN B. BANE, who died on May 24, 1962, would have testified as follows:

a. He was a member of the Bar of the District of Columbia.

b. He was with the Securities and Exchange Commission approximately from the date of its organization and retired in 1954 as chief of its Corporate Finance Division.

c. That he was a stockholder of Cal Moab Uranium Corporation and familiar with the tradability of its stock.

d. That he knew that 1,000,000 shares of Cal Moab stock were tradable pursuant to Securities and Exchange Commission regulation "A".

e. That he advised Donald and Forrest Parrott that they could trade their so-called "Regulation A" shares.

f. That he was familiar with the escrow agreement dated May 23, 1961, by which Forrest Parrott placed his shares in escrow and thereby divested himself of any authority to control Cal Moab.

8. JACK FARRELL, who died in 1964, would have testified as follows:

a. He was a stockbroker trading under the name "Farrell Securities," New York, New York.

b. He traded in Cal Moab Uranium Corporation, later known as Hydramotive Corporation, stock prior and subsequent to June 1961.

c. His trading in Cal Moab was not in any way related to any literature distributed by Hydramotive or any repre-

sentations made by any of the defendants to this action.

d. That his customers' interest in Cal Moab, later Hydramotive, stock was stimulated by sources unrelated to the defendants.

9. JOSEPH SHERNOV, who died in 1964, would have testified as follows:

a. He was a stockbroker trading under the name of "Central Securities."

b. He traded in Cal Moab, later Hydramotive, stock prior and subsequent to June 1961.

c. His trading in Cal Moab was not in any way related to any literature distributed by Hydramotive or any representations made by any of the defendants to this action.

d. That his customers' interest in Cal Moab, later Hydramotive, stock was stimulated by sources unrelated to the defendants.