**UNITED STATES of America**
**v.**
**James Henry RAND, III, et al.**
**No. CR 68–433.**

United States District Court
N. D. Ohio, E. D.
Jan. 9, 1970.

**1232**

Malcolm Douglas, Robert H. Trenkamp, Cleveland, Ohio, Solomon H. Friend, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Defendants, James Henry Rand, III (Rand) and Rand Development Corporation (Rand Development), of which Rand is president, have moved to dismiss an indictment charging them with manipulating the market price of Rand Development stock for the purpose of defrauding the Franklin National Bank of New York. It was charged that they employed a scheme, a publicity campaign for a cancer vaccine developed by them, in order to induce the purchase of Rand Development stock and to obtain credit and loans; that they published and disseminated false, misleading and fraudulent reports and news stories concerning the efficacy of the cancer vaccine with the intention of raising the market price of the stock; and that they transferred 60,000 shares of inflated stock to Franklin National Bank to secure a loan to a subsidiary of Rand. They are further charged with violation of the Federal Mail Fraud Statute (18 U.S.C. § 1341) and with violation of Section 10 of Securities & Exchange Act (15 U.S.C. § 78j(b) and 78ff(a)) and Rule 10(b)(5) under 17 C.F.R. 240.10b–5.

To fully understand the several grounds for defendants' motion, the background leading to this criminal action must be reviewed. For several years prior to 1966, Rand was working in Cleveland on a vaccine which, it was hoped, would cure cancer. On August 19, 1966, an article appeared in the Cleveland Plain Dealer on the work that was being done on the vaccine. It is unknown who initiated the early news articles. Some rather extravagant language about the actual benefits or expectations of the vaccine was published. Rand Development stock began to rise in price on the over-the-counter market. The Securities & Exchange Commission looked into the matter and suspended trading in the stock until a statement was issued by Rand Development as to what it claimed for the vaccine. The suspension was lifted in January of 1967.

In the meantime, the Food and Drug Administration had become involved with the Rand vaccine. In January of 1967, the FDA ordered more and better testing of the vaccine. By this time Rand was shipping quantities of the vaccine throughout the country for use in cancer treatment. In February of 1967, the FDA brought an action in the Northern District of Ohio (Civil Action No. 67–91) to enjoin further interstate shipment of the vaccine. A temporary restraining order issued on February 7, 1967. Trial on the merits was commenced on February 17 and ended on March 2, 1967, after which a permanent injunction issued.

Twenty-one months after the conclusion of the civil case, a criminal action was brought against defendants on information furnished by the SEC. The fabric of the facts becomes tangled as to what events and circumstances lead to the indictment.

Defendants have moved to dismiss on three grounds:

(1) That the twenty-one month delay between the conclusion of the civil proceeding and the bringing of the criminal indictment was unreasonable, prejudicial, and denied the defendants their right to a speedy trial under Rule 48(b) of the Federal Rules of Criminal Procedure,

and the Fifth and Sixth Amendments to the Constitution.

(2) That the grand jury indictment rested on illegally-obtained evidence, and that there was a breach in the secrecy surrounding the grand jury's deliberations.

(3) That the Government used the civil action to gather evidence from defendants, which evidence formed the basis for the indictment, in violation of defendant Rand's Fifth Amendment privilege against self-incrimination.

In view of the decision reached on ground 3, it becomes unnecessary to rule on grounds 1 and 2.

There are three elements in the third ground of defendants' motion to dismiss. They contend (1) that the Government utilized a civil proceeding in order to discover evidence for a criminal prosecution, a so-called "parallel proceeding"; (2) that the Government and the District Court promised defendants an immunity from all criminal prosecution; and (3) because of the alleged immunity and an absence of any knowledge that criminal prosecution was in the offing, defendant Rand took the stand in the civil injunctive proceedings and gave evidence which is now being used to incriminate him.

The relevant evidence and the briefs have been carefully reviewed. They firmly convince the Court that the Government engaged in activity which is totally obnoxious to the due process clause of the Fifth Amendment and, therefore, the indictment against defendants should be dismissed.

A close examination of the three elements of defendants' arguments follows.

### I. *Utilizing civil proceeding to discover evidence for a criminal prosecution*

■ The defendants argue that the Government used an earlier civil proceeding in order to gather evidence for a criminal prosecution. The civil action of February, 1967, was begun by the FDA to determine whether Rand Development should be enjoined from trans-porting its cancer vaccine in interstate commerce. It appears that defendants were fully cooperative with the FDA. Defendants assert, and the Government concedes, that Rand was willing to submit to an injunction on interstate shipments of the drug. But the Government says this was not enough; it was necessary to enjoin all manufacture of the drug. The Government uses this rationale on which to base the necessity for the civil trial. However, there is nothing in the complaint for the injunction referring to enjoining production of the drug (See plaintiff's Exhibit A). Defendants contend, and the evidence tends to prove, that the Government went forward with this trial, despite defendants' willingness to submit.

At the trial, defendant Rand cooperated fully with the Government's investigation. He was called on cross-examination by the Government and also took the stand in his defense. Rand testified openly regarding matters entirely outside the scope of the issues in the civil proceedings. He discussed his interviews with the press concerning the vaccine (Transcript, pp. 631–645), the impact of the news on the market price of the stock (Transcript, pp. 619–622), and certain stock transfers (Transcript, pp. 627–630).

This information was completely irrelevant to whether Rand Development should be enjoined from transporting the vaccine in interstate commerce. All common sense dictates this finding. Yet the Government argues for the relevancy of this information. It contends that, in weighing whether the injunction should issue, the trial judge had to take into account evidence of defendants' good faith or lack of it; and that evidence of illegal conduct in stock transfers or stock price manipulation would, therefore, be relevant. Rand, the Government says, was portraying himself as a philanthropist, whereas the Government wanted to show that he was, in fact, a rascal. (Transcript, p. 54.)

Such a consideration could indeed cause a nod in the Government's direc-

tion, but for this: The Government repeatedly and strenuously asserted in its briefs that neither the United States Attorney nor the District Judge were aware of the possibility of criminal prosecution during the early part of the trial. During the trial, there were some conferences in chambers wherein defendants maintain an immunity from criminal prosecution was granted. While this issue will be discussed further below, it is crucial to note at this point that the Government urges that the scope of the immunity could not have included SEC violations because no one even knew of their existence. These assertions so patently contradict themselves that they must be rejected in total. One cannot be asked to believe that at one moment the Government was seeking evidence concerning something, which the next moment it knew nothing about. The Government seeks to bail itself out by asserting that it became aware of the SEC issues late in the trial. But the trial lasted only two weeks. It is hard to believe this factor would have burst on the scene so suddenly. Moreover, if it had, it would seem that the Government would have been required to inform defendants that the immunity they had discussed was to be tempered in view of the new circumstances, and especially before defendant Rand took the stand.

With regard to the SEC question, the Government admits that the SEC participated to some extent in the FDA civil proceedings. The SEC was investigating Rand Development prior to and concurrently with the FDA. It is likely that the SEC was present at the injunctive proceedings (See Trenkamp's Affidavit, p. 5). In any event, much of the testimony elicited from defendant Rand was of interest to the SEC. Moreover, this being a civil proceeding, the liberal discovery rules of the Federal Rules of Civil Procedure aided the Government in disclosing incriminating evidence. Records of the National City Bank of Cleveland, transfer agent for Rand Development, were subpoenaed.

The Government concedes that the SEC and the FDA cooperated in some phases of the investigation of defendants. They assert that it is the duty of a government agency to look at information obtained by another agency in order to enforce their respective statutes. SEC contends that it began its investigation prior to and independently of the FDA.

The Court agrees that the FDA proceeding was probably not used by the SEC as a facade to gather evidence. What this Court finds is not villainy, but misguided strategems. The Government, knowing but not informing defendants that criminal proceedings were pending, began a civil proceeding in which it obtained information useful in a subsequent criminal action. The evidence was irrelevant to the merits of the question in the civil case. It was elicited from a defendant who had been lulled into believing he was immunized from prosecution. It was garnered from a proceeding that appears to have been pointless to begin with, in view of defendants' willingness to cooperate. All of these elements lead to the inescapable conclusion that the Government was engaged in an obnoxious form of using parallel proceedings.

In United States v. Detroit Vital Foods, 407 F.2d 570 (6th Cir. 1969), cert. granted June 2, 1969, 395 U.S. 932, 89 S.Ct. 1998, 23 L.Ed. 447, sub nom. United States v. Kordell, the Government began a civil action under the Food, Drug & Cosmetic Act. Defendants were served with interrogatories by the Government, and were informed that the Government contemplated taking criminal action. The Sixth Circuit Court of Appeals reversed the subsequent criminal conviction. It found that "evidence and leads obtained by reason of the interrogatories were used against the defendants in the criminal case," *id* 407 F.2d at 575, and held "that the Government may not use evidence against a defendant in a criminal case which has been coerced from him. \* \* \*." *Id* at 575–576. The brief of the Govern-

*ment on appeal from the Sixth Circuit's decision in United States v. Detroit Vital Foods, p. 25, states:*

"We recognize that the existence of parallel civil and criminal proceedings poses delicate problems for the agencies involved. We do not deny the need for care in such situations."

At page 31, it states:

"The Government cannot, of course, use one kind of proceeding solely for the purpose of obtaining evidence for use in another type of proceeding. * * Such bad faith use of criminal or civil procedures is impermissible. * * * Even without a showing of bad faith, the courts have found unfairness where a government agency, after initiating an administrative or civil action against the defendant, did not inform him of the fact that criminal prosecution against him for the same conduct was seriously contemplated or had been recommended. Such failure to apprise the defendant of the contemplated criminal proceeding has been held to preclude the Government's use therein of evidence obtained in the civil proceeding. See United States v. Parrott, 248 F.Supp. 196 (D.D.C.), and cases cited therein."

In United States v. Parrott, 248 F.Supp. 196, 202 (D.C.1965), a case remarkably similar to the present one, the Court held that "the Government may not bring a parallel civil proceeding and avail itself of civil discovery devices to obtain evidence for subsequent criminal prosecution."

The Government urges suppression of the evidence if it is found to have been improperly obtained. The foregoing findings, without more, would not necessarily require the dismissal of the indictment. But there is more.

## II. *The Immunity*

The defendants allege that during the course of the civil proceedings, the Government and defendants reached an understanding that defendants were to be granted an immunity from criminal prosecution. This understanding allegedly arose during conferences in the chambers of the trial judge. The nature and scope of the immunity is disputed, as is the very existence of any promises whatsoever. The Court has been besieged with affidavits.

Defendants aver that during the course of the trial a conference was held in chambers wherein the United States Attorney (the late Merle M. McCurdy) and the Court allegedly said to defendants' counsel that no criminal prosecution would ensue as to matters introduced in the case, provided that any injunction which might issue were complied with (Trenkamp's Affidavit, p. 6). Defendants point to a number of instances in the trial judge's statements and opinion in which he seems to allude to such an understanding. These instances (Transcript, pp. 71, 72, 90, 108), however, fail to confirm that the trial judge was making reference to an immunity. The more reasonable interpretation is that the trial judge was discusing the effect of an injunction, that compliance with it would relieve defendants of criminal sanctions, e. g.: "It means if he violates the injunction, he may be subjected to prosecution for the crime under this law of violating the injunction. * * *" (Transcript, p. 108).

Defendants aver that another conference was held in the trial judge's chambers on May 2, 1967, after the injunction had issued. Defendants' counsel were anxious to be reassured that the supposed earlier promise was still in effect. Defendants say the Court and the United States Attorney reaffirmed that the Government had no intention to bring criminal proceedings with reference to matters involved in the civil trial (Trenkamp's Affidavit, p. 9). Defendants' counsel were concerned because they would not have let defendant Rand testify in February had it not been for these assurances (Trenkamp's Affidavit, pp. 9–10). Co-counsel, Harley McNeal's affidavit repeats Mr. Trenkamp's avowal that they would not have permitted Rand

to testify were it not for these assurances (McNeal's Affidavit, p. 2). The trial judge stated in his Supplemental Affidavit that he has "no definite memory whatsoever" of this May 2 conference (Supplemental Affidavit, p. 6).

The reply of the Government to these assertions was received on May 14, 1969, the same day on which the trial judge's first affidavit was received. Defendants point to supposed inconsistencies in these replies. The Government says, with regard to an immunity, that "the facts as represented in defendants' motion and brief as well as the statements made by the affidavit of his attorney simply are not true." (Government's Answer, p. 12). This statement of complete denial of defendants' averments is followed by a more esoteric statement. "The trial court certainly never promised, granted, suggested, or even implied whether in court or in chambers—that defendant would enjoy immunity from future criminal prosecution." (Government's Answer, p. 12.) On the other hand, the trial judge says, at page two of his affidavit: "We agree with Attorney Harley McNeal when he avers in his affidavit that the understanding between all lawyers and the Court was 'that if defendants complied with the terms of any injunction which might issue, no criminal prosecution against (defendants) would ensue as to matters introduced in that case.'" Clearly, the judge was alluding to an understanding. The Government seems, in the first quoted sentence, to be denying everything. But in the second sentence it implies that something was agreed upon, but not as to future criminal prosecutions. Defendants say the Government flatly contradicts the judge's affidavit. This is not the case. The two statements can be made consistent. The Government did not say that no agreement at all was envisioned; rather, the Government says the immunity did not cover "future criminal prosecution." The question then becomes: What is the significance of the dichotomy between "no criminal prosecution * * * would ensue as

to matters introduced in that trial," and "immunity from future criminal prosecution"?

There is agreement in the affidavits of Mr. McNeal, Mr. Trenkamp, and the trial judge in this regard. There was an agreement, akin to a grant of immunity, and it extended to all "matters introduced" in the injunctive proceeding, provided that defendants complied with the terms of any injunction which might issue. The Government imports the phrase *"future* criminal prosecutions," and it serves only to confuse the situation. The Government would have us believe that the scope of the immunity related only to civil injunctive and FDA matters. It maintains that the trial judge and the United States Attorney had not been aware of pending SEC criminal action at the time the grant was made. However, it is clear that the SEC was working with the FDA, and the United States Attorney questioned defendant Rand about matters of relevancy only to SEC (See discussion in Part I). What the Government appears to be doing in this argument is to obscure the plain question before us: An immunity as to "matters introduced" at the trial was contemplated; this Court must, therefore, determine what matters were introduced and therefore covered by the immunity.

■ "Matters introduced" at the trial clearly must include all testimony. Whether the trial judge was made cognizant of the impending introduction of SEC matters is not dispositive. Defendants were entitled to rely on the assurances made by the Government. Defendant Rand could have asserted his right not to testify. Instead he relied on a fair interpretation of the words of the immunity grant, and took the stand and testified openly. The judge states that during the conference in chambers, "this Court said not one word" (Supplemental Affidavit, p. 2). "This Court stressed nothing in such conference. I made no promise of any kind in such conference. I listened to what was said and did all my talking in the courtroom. * * *"

Even though defendants did not have the judge's oral assurance, they were entitled to rely on the United States Attorney's words. Implicit in defendants' contention is that the trial judge's silence constituted an apparent acquiescence. Whether this silence was an acquiescence is unnecessary to decide. It was the Government to whom they looked for immunity, not the Court.

 At the trial, there was testimony concerning alleged stock transfers by defendant Rand (Transcript, pp. 657–679), and testimony concerning magazine articles which enhanced the price of Rand Development stock (Transcript, pp. 200–221, 307–345, 531–547). In addition, there was defendant Rand's testimony cited in Part I. Furthermore, findings were made in the case based on this testimony. (See Findings, pp. 21, 22, 23 and 24). The conclusion is inescapable that these matters were "matters introduced" in the trial and therefore within the scope of the immunity. The language of these findings find their way into paragraphs 5, 7, 9, 10, and 11 and 12 of the criminal indictment.

 It is clear that when defendant Rand, having relied on the assurance of the United States Attorney of this immunity, testified on cross-examination to matters forming the basis of the present indictment, every item of evidence elicited from him is so tainted that the indictment must be dismissed.

III. *Self-incrimination*

In United States v. Detroit Vital Foods, 407 F.2d 570 (6th Cir. 1969), it was pointed out that when a defendant is aware of the possibility of criminal proceedings, he is caught on the horns of a dilemma. He may either testify against himself in the civil proceedings or be held in contempt. The danger is even greater in a situation where the defendant is unaware of pending criminal action. United States v. Parrott, 248 F. Supp. 196 (1965). In the *Parrott* case, at p. 200, it was said that: "The Court is of the opinion that the danger of prej-

udice flowing from the testimony out of a defendant's mouth in a civil proceeding is even more acute when he is unaware of the pending criminal charge." Defendant is, in effect, placed in a trap. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; United States v. Thayer, 214 F.Supp. 929 (1963). The Government maintains that defendant Rand could have invoked his privilege not to testify. But it is unrealistic to suppose that defendant will be on guard against incriminating himself when he is unaware that criminal proceedings are contemplated. Rand was indeed completely unaware of the danger, having been lulled by the immunity and the absence of any warning of the pending criminal action. In such a situation, it is unfair in the extreme to penalize defendant Rand for failure to invoke his privilege against self-incrimination.

This Court cannot adopt the view as expressed in United States v. Simon, 373 F.2d 649 (C.A.2, 1967) and urged upon this Court by the Government. In *Simon*, the defendants were under indictment for mail fraud and SEC violations. They sought to enjoin a trustee in reorganization from taking their depositions for use in a civil case concerning similar matters, arguing that the deposed information would be self-incriminating. The Second Circuit Court of Appeals, Lumbard, J. said:

"The fact that additional testimony thereby becomes available to the government is merely the natural by-product of another judicial proceeding. * * *
" * * * The same dilemma is faced by any witness in a civil or criminal trial who is himself under investigation or indictment for other crimes. Such a witness must either invoke his privilege against self-incrimination, or assume 'the general duty to give what testimony one is capable of giving.' See 8 Wigmore, Evidence, Section 2192 (McNaughton, Rev. 1961)."

The philosophy of the *Simon* case is as inapplicable here as the fact situation.

There the defendants were well aware of the immediacy of criminal consequences and had an opportunity to invoke their privilege. In the present case, defendant Rand had no reason to believe that anything revealed would be used against him.

The evidence is clear that defendant Rand was, in the circumstances, compelled to testify against himself. The Court also finds: (1) There was an immunity; (2) Defendants were entitled to rely on it; (3) The immunity covered all "matters introduced" at the civil trial; (4) The SEC matters testified to are within the scope of "matters introduced" language of the immunity; and (5) Use of such evidence elicited would violate the immunity granted.

In view of these findings, the conclusion is inescapable that there must be an end to this litigation. To simply suppress the evidence which the Government obtained by the methods explored above would not be sufficient to remedy the violation of defendant Rand's constitutional rights. Accordingly, the indictment is dismissed.

The foregoing constitutes the Court's findings of fact and conclusions of law.