J-A17013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PATRICK JOSEPH MCLAINE | |
| Appellant | No. 2600 EDA 2013 |

Appeal from the Judgment of Sentence July 31, 2013
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0000830-2012

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY OTT, J.:                         **FILED NOVEMBER 13, 2015**

Patrick Joseph McLaine appeals from the judgment of sentence imposed on July 31, 2013, in the Court of Common Pleas of Northampton County.   On January 11, 2013, a jury convicted McLaine and his co-defendant, Robert J. Kearns,[1] of theft by failure to make required disposition of funds received.[2]   As will be discussed below, the court ultimately

---

[1]  Kearns has also filed an appeal at Docket No. 2480 EDA 2013, raising substantially similar claims.  The Commonwealth has filed cross-appeals with respect to McLaine and Kearns at Docket Nos. 1685 EDA 2013 and 1682 EDA 2013, respectively.  On April 2, 2015, the Commonwealth filed an application for consolidation of all four companion cases.  By *per curiam* order entered on April 21, 2015, this Court denied the Commonwealth's application for consolidation, but directed that the appeals be listed consecutively.

[2]  18 Pa.C.S. § 3927.

sentenced McLaine to a term of six to 12 months' incarceration, 12 months' probation, a fine of $2,500.00, and restitution in the amount of $832,460.00. On appeal, McLaine raises numerous issues, concerning the legality of his sentence, the sufficiency of the evidence, the weight of the evidence, the admissibility of certain evidence, and prosecutorial misconduct. After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm the conviction, but are constrained to vacate the sentence and remand for resentencing.

The facts and procedural history are as follows.[3] McLaine and Kearns were the two principals of a company known as Municipal Energy Managers, Inc. ("MEM"). On July 2, 2007, McLaine and Kearns entered into a written contract with the Township of Bethlehem, a municipality in Northampton County ("Bethlehem Township"). The contract provided MEM would act as an agent for Bethlehem Township to facilitate the purchase of township street lights from the public utility company, Pennsylvania Power and Light ("PPL").[4] McLaine and Kearns drafted the contract and determined the total cost to do all work necessary for Bethlehem Township to purchase the street

_____

[3] The trial court set forth a detailed and thorough factual and procedural history in its Pa.R.A.P. 1925(a) opinion. **See** Trial Court Opinion, 6/2/2014, at 1-31. We will refer back to the court's recitation in our analysis.

[4] The purpose was to save the township money by accessing a lower utility rate for municipal-owned streetlights.

lights from PPL. A price of $1,001,230.00 was to be used to pay any and all costs of the purchase including, but not limited to, paying PPL for the transfer of the street lights. The contract provided performance was to occur within a period of 12 to 18 months, ending anywhere between July 2, 2008 and January 2, 2009, and was considered completed when ownership of the street lights was transferred from PPL to the township. Additionally, the contract stated the township would be receiving the lower utility rate by January of 2009. For its services, MEM was to receive a five percent commission of $50,060.00.

To begin performance, MEM requested Bethlehem Township pay them $832,460.00. On July 3, 2007, McLaine and Kearns received a check in the requested amount. On July 5, 2007, the check was deposited into a general corporate bank account in the name of MEM, which McLaine and Kearns jointly controlled.[5]

In October 2007, McLaine and Kearns wrote checks from the MEM general corporate account to themselves. Specifically, on October 1, 2007, a check was made payable to Kearns for the amount of $366,600.00. That same day, a check was issued to McLaine in the amount of $499,945.000, as well as a second check to McLaine in the amount of $109,059.00. All three

---

[5] With respect to the contract, there was no escrow requirement that Bethlehem Township's funds be held separately from the rest of MEM's other accounts. **See** N.T., 1/10/2013, at 162 ("The evidence reveals that the Commonwealth admits there was no escrow requirement.").

checks were signed by both defendants. At trial, McLaine and Kearns testified these checks represented bonuses paid to themselves.

On August 5, 2009, PPL sent a letter to Kearns, stating that it had learned MEM was performing unauthorized work on its streetlights. The letter identified Bethlehem Township as one of the affected municipalities.

Despite receiving the funds, MEM did not contact PPL to initiate the transfer of street lights until August 10, 2009, eight months past the 18-month completion deadline, by sending a letter announcing its intent to purchase the streetlights. On September 17, 2009, PPL sent a letter to MEM, outlining the estimated costs of the total project, which was to be $271,180.00, well below MEM's estimate of $1,001,230.00. The letter also requested MEM make a deposit to PPL in the amount of $22,525.00 in order to initiate the process of the light transfer. McLaine and Kearns did not respond to PPL's request or make the payment. On October 5, 2009, MEM sent Bethlehem Township an invoice for $131,438.00. The township did not pay it.

In January of 2010, a grand jury investigation was conducted in relation to this matter. On January 26, 2012, the grand jury returned a presentment, recommending the arrest of McLaine and Kearns on charges of theft by failure to make required disposition of funds received, misapplication of entrusted property, and criminal conspiracy.

A criminal complaint was then filed on February 16, 2012. As noted above, the two men were tried together. The joint jury trial began on January 7, 2013. On January 11, 2013, the jury found McLaine and Kearns guilty of theft by failure to make required disposition of funds received, but not guilty of the other two charges.

On April 12, 2013, and April 19, 2013, McLaine and Kearns, respectively, were both sentenced to a term of 16 of 60 months' incarceration, 60 months of probation, and restitution in the amount of $832,460.00. The court graded the theft offense as a third-degree felony pursuant to 18 Pa.C.S. § 3903 (grading of theft offenses) on the basis that the value of the theft was in excess of $2,000.00.

On April 24, 2013, McLaine and Kearns filed motions challenging the trial court's grading of the offense as a third-degree felony pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000). They argued that the verdict slip could not support a felony conviction because it did not require the jury to determine the value of the property that gave rise to the convictions, *i.e.*, the commencement check issued by Bethlehem Township. The trial court agreed and on May 31, 2013, granted the motion.

On June 4, 2013, the court re-sentenced McLaine and Kearns with regard to the theft offense, grading it as a third-degree misdemeanor, and ordered them to serve a term of six to 12 months' incarceration, 60 months' probation, a fine of $2,500.00, and restitution in the amount of

$832,460.00. Subsequently, on June 13, 2013, McLaine and Kearns filed post-sentence motions, including a motion for reconsideration of sentence. On July 31, 2013, the trial court entered an order, modifying their sentences to a consecutive period of probation of 12 months rather than 60 months. The remainders of their sentences were not changed. This appeal followed.[6]

McLaine raises the following issues on appeal:

1. Whether the jury's verdict was supported by sufficient evidence?

2. Whether the jury's verdict was against the weight of the evidence?

3. Whether the trial court erred in permitting the introduction of [McLaine's] alleged prior bad acts arising in other jurisdictions, where those acts were not convictions, were not substantially related to the case at hand, and did [not] fall under an exception to the prohibition against the admission of prior bad acts?

4. Whether, where PPL records were relevant and necessary to the presentation of a defense in this case, the trial court erred in quashing [McLaine]'s pre-trial subpoena of such records?

5. Whether, following the District Attorney's inappropriate reference to [McLaine] as a "crook in a suit" and "Ponzi scheme operator," in his closing argument, the trial court erred in failing to grant a mistrial?

6. Whether, where the solicitor conducting the deposition was acting in concert with the prosecuting district attorney, the

_____

[6] On August 9, 2013, the trial court ordered McLaine to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). McLaine filed a concise statement on August 28, 2013. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on June 2, 2014.

lower court failed to suppress statements made at [McLaine]'s deposition in the absence of **Miranda**[7] Warnings?

7. Whether, where [McLaine] was convicted of Theft by Failure to Make Required Disposition of Funds, a misdemeanor of the third degree, the maximum penalty for which is one year of incarceration, the trial court illegally sentenced [McLaine] to six to twelve months of incarceration plus one year of consecutive probation?

McLaine's Brief at 9.[8]

In his first issue, McLaine complains there was insufficient evidence to support his theft conviction.

Our standard of review for such challenges is well-settled:

[W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

**Commonwealth v. Troy**, 2003 PA Super 340, 832 A.2d 1089, 1092 (Pa.Super.2003) (citations omitted).

---

[7] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

[8] We have reorganized and renumbered the issues for our analysis.

*Commonwealth v. Gonzalez*, 109 A.3d 711 (Pa. Super. 2015), *appeal denied*, __ A.3d __ [270 MAL 2015] (Pa. Sept. 29, 2015).

Theft by failure to make required disposition of funds received is defined as follows:

> A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S. § 3927.

The crime has four elements:

1. The obtaining of property of another;

2. Subject to an agreement or known legal obligation upon the recipient to make specified payments or other disposition thereof;

3. Intentional dealing with the property obtained as the defendant's own; and

4. Failure of the defendant to make the required disposition of the property.

*Commonwealth v. Crafton*, 367 A.2d 1092, 1094-1095 (Pa. Super. 1976).

Here, McLaine states three of the four elements were not met. With respect to the first element, he argues the Commonwealth did not demonstrate he "obtained the property of another" because, where, as here,

- 8 -

a party partially performs under a contract, and advance money is paid pursuant to that contract, that advanced money cannot be considered the property of another. McLaine's Brief at 22. Relying on **Commonwealth v. Austin**, 393 A.2d 36 (Pa. 1976), McLaine alleges MEM and Bethlehem Township entered into a binding contract, Bethlehem Township made an advance payment pursuant to the contract, MEM partially performed under the contract, and therefore, McLaine did not obtain the money as property of another. McLaine's Brief at 22-23. In support of his argument, he notes the contract called for "make ready work" to be completed on the streetlights prior to completion, and that MEM actually did perform such work was evidenced by a $50,000 invoice it received from a subcontractor regarding the project. **Id.** at 24. Furthermore, McLaine claims MEM's actions indicated both an intent to comply with the contract from its inception and partial performance of the contractual obligation. **Id.** at 25. As such, McLaine contends the Commonwealth failed to prove specific intent. **Id.** Moreover, he states the intention of the owner becomes the primary focus to determine if possession has passed, and here, no facts indicated that Bethlehem Township ever expected a return of the money paid to MEM. **Id.** at 27. Rather, McLaine asserts the township merely sought the contractual duties be performed. **Id.** He states MEM intends to make good on the contract, but was impeded by the actions of a third party, PPL. **Id.**

With respect to the second element, McLaine argues the Commonwealth did not establish the conduct at issue was "subject to an agreement or known legal obligation upon the recipient to make specific payments or other disposition thereof." *Id.* at 30. He states that while a deposit was tendered to MEM, Bethlehem Township "oversimplifies" the terms of the contract, and although some of the money was to be used to purchase the streetlights, other money was to be used for other services provided by MEM and were provided pursuant to the terms of the agreement, including the make ready work and maintenance of streetlights. *Id.* at 30-31. He alleges the agreement is silent with respect to MEM's obligations regarding the funds after they had been tendered by the municipality. *Id.* at 31. With respect to the failure to actually acquire the lights, McLaine argues that no conversion took place as a result of PPL's actions. *Id.* at 32. Lastly, he states that although he was a member of MEM, he had virtually no involvement in the Bethlehem Township project.

As to the third element, McLaine asserts the Commonwealth did not establish McLaine "intentionally dealt with the property obtained as his own." *Id.* He states the Commonwealth presented no evidence that he had the intent to handle the funds tendered to MEM by Bethlehem Township as his own property and, assuming *arguendo* it was true, the funds became MEM's property at the time they were passed from the municipality to MEM. *Id.* He also avers that, as to the dealing with money improperly, the

Commonwealth only demonstrated MEM paid PPL the township's money to cover its debts. *Id.* at 33. McLaine proclaims he did not personally deal with that money or act as though it was his own. *Id.*

The trial court initially addressed the sufficiency of the evidence claim when it determined prior to trial that the Commonwealth presented a *prima facie* case of theft, opining:

> At the outset, we note that there is significant overlap in the case law in the application of these elements. In our view, the relevant inquiry is whether the totality of the evidence supports a *prima facie* finding of criminal intent to defraud. *See, e.g.*, *Commonwealth v. Lagana*, 662 A.2d 1127 (Pa. Super. Ct. 1995). Accordingly, we will analyze the first two elements in depth and then apply our conclusions in a summary fashion to the third and fourth elements.
>
> We begin with the Defendants' contention that their receipt of the commencement check does not constitute "obtaining of property of another" pursuant to the Superior Court of Pennsylvania's holding in *Commonwealth v. Austin*, 393 A.2d 36 (Pa. Super. Ct. 1978). In *Austin*, the Superior Court overturned a non-jury conviction for Theft in a case where the appellant-contractor had accepted advance money on a construction contract but rendered only partial performance thereunder. *See id.* After a careful review of the record, the Superior Court concluded that there was insufficient proof of criminal intent to affirm the conviction. *Id.* at 41.
>
> With respect to the first element, the court held that the appellant's acceptance of advance money did not constitute "obtaining of property of another." *Id.* at 38. It based this conclusion on the following passage from *Commonwealth v. Bartello*, 301 A.2d 885 (Pa. Super. Ct. 1973), wherein the Superior Court reversed a conviction for fraudulent conversion:
>
> > … 'in a single contract providing for certain services at certain prices that where there is a transfer of money, within the contract price, even in advance of the due date, that title as well as possession passes and only a

- 11 -

contractual obligation remains.' *Id.* at 38 (quoting *Bartello*, 301 A.2d at 887).

Based upon this authority, the Defendants contend that title and possession to the Township's funds passed to them upon receipt. They conclude that they are immune from criminal prosecution because a person cannot fraudulently convert his own property. We disagree, because we do not read *Austin* (and the related case law) as establishing such a hard and fast rule.

To the contrary, in *Austin*, the Superior Court reviewed a number of factors before concluding that the appellant was not subject to criminal liability, including: (a) his purchase of materials for the project and continued performance for about two months; (b) his willing provision of an accounting; (c) the arguable necessity of his expenditures; (d) his consultation with a lawyer before discontinuing the project; (e) his realization that the project was a losing proposition; and ([f]) the absence of express restrictions on the use of the advance monies. 393 A.2d at 38-41.

Likewise, in *Commonwealth v. Lagana*, 662 A.2d 1127 (Pa. Super. Ct. 1995), the Superior Court evaluated all of the evidence before concluding that the Commonwealth established its *prima facie* case. The proof of criminal intent in *Lagana* consisted of: (1) the defendant's receipt of municipal funds subject to a known obligation to purchase an insurance policy; (2) his failure to purchase the policy; (3) his commingling of the municipal funds; (4) his use of some or all of the commingled funds to finance his own business; (5) his possible misrepresentations to various municipal employees; and (6) his retention of the township's money until ordered to return it. 662 A.2d at 1129-1130.

Applying this standard, we conclude that the totality of the circumstances in this case establishes a *prima facie* showing of criminal intent. For one thing, the Defendants inexplicably delayed their initiation of formal contact with PPL until eight months after the project's outermost deadline. By that time, nearly two years had passed since they wrote personal checks to themselves for almost one million dollars from MEM's corporate account. During this interval, the Defendants provided little feedback to the Township's executives concerning their use of the commencement check.

In addition, the disparity between MEM's and PPL's project estimates suggest that the Defendants, who had significant experience in the field, deliberately overestimated the project to pad their compensation and ensure that MEM's corporate account was flush. Further proof of their criminal intent includes: (a) the Defendants' failure to pay any portion of PPL's initiation fee; (b) their unsatisfactory response to the Township Solicitor's request for an accounting and certification; and (c) their inability to recall any justification for the personal checks during their depositions.

Finally, even if some portion of the commencement check did pass to the Defendants under *Austin*, we conclude that it would be limited to MEM's compensation under the Agreement plus reasonable costs, a figure considerably less than $832,460.

We turn now to the second element, the requirement that the Defendants received the commencement check "subject to an agreement of known legal obligation upon the recipient to make specified payments or other disposition thereof." Here, the Defendants argue that the Commonwealth has misconstrued the Agreement as a cost plus contract instead of a lump sum contract. In addition, the Defendants argue that the Agreement did not prohibit the commingling of funds or require that they place the commencement check into escrow.[1]

[1] For the purposes of this motion, we accept as true the Defendants' assertion that the commencement check did not include a written notation restricting its use once disbursed to MEM.

Our research indicates that, in a lump sum contract, the contractor is entitled to keep the difference (if any) as profit when he completes a project under the fixed total cost. In contrast, in a cost-plus contract, the fee is set in advance and the contractor is reimbursed for the actual cost of the work. Presumably, the Defendants would enjoy unrestricted use of the commencement check in a lump sum contract.

It is apparent to the Court, however, that the Agreement includes at least one indicator of a cost-plus contract – a fixed compensation provision based upon a percentage of the cost of the work. Our research suggests that a cost-plus construction

contract does not provide unfettered discretion over the use of advance money. Given this uncertainty, we conclude that it would be improper to make a potentially dispositive determination as to whether the Agreement is a lump sum or cost-plus contract.

Moreover, as noted above, we view the gap between the cost estimates as rebuttable proof of the Defendants' criminal intent. In this regard, we observe that the Defendants' compensation under the Agreement was directly tied to their inflated cost estimate.

Next, we address the Defendants' assertion that they were not prohibited by law or contract from depositing the commencement check into MEM's corporate account. We agree with this assertion, in principle. *See Commonwealth v. Crafton*, 367 A.2d 1092 (Pa. Super. Ct. 1976) (an agent may commingle funds without penalty; criminal liability does not attach until the requirement payments are not made). However, case law establishes that the commingling of funds does give rise to criminal charges when the actor has exhausted the money on unrelated expenses and consequently cannot meet his payment obligation.

For example, in *Commonwealth v. Fritz*, 470 A.2d 1364 (Pa. Super. Ct. 1983), the Superior Court held that the appellants' deliberate practice of commingling ticket sales in the terminal's operating account and then using the funds to pay its operating expenses established that the appellants dealt with the receipts as if they were their own. 470 A.2d at 1376-1368. This evidence, in conjunction with proof of their inability to repay the ticket proceeds upon request, was enough to uphold their convictions. *Id.* at 1368-1369.

Here, the evidence establishes that the Defendants used the commingled funds to pay themselves bonuses far in excess of their compensation under the Agreement. The Defendants cannot plausibly argue that these expenditures were necessary for MEM's continued operation or the project's completion. Moreover, the payments depleted MEM's corporate account to a level below even PPL's minimal cost estimate.

We acknowledge that, without more, such evidence would be insufficient to charge the Defendants with Theft – criminal

- 14 -

liability does not attach until the required payments are not made. However, we disagree with the Defendants' assertion that all preconditions to transfer had to be in place for criminal liability to attach. Instead, we hold that MEM became subject to criminal prosecution when it failed to provide a satisfactory response to the Township's February 2010 request for certification that it had enough money to complete the project. *Fritz*, 470 A.2d at 1366 (citing *Crafton*, 367 A.2d at 1094-1095).

We turn now to the third element, the requirement that the Defendants intentionally dealt with the Township's property as their own. As noted above, in *Commonwealth v. Fritz*, the Superior Court held that the terminal owners' use of commingled proceeds to pay operating expenses and companies other than those to whom the proceeds should have gone established that they had dealt with the property of another as their own. 470 A.2d at 1366-1367.

Pursuant to *Fritz*, we find the evidence that the Defendants commingled the Township's money and then used it to pay themselves bonuses establishes that they intentionally dealt with the Township's property as their own.

With respect to the fourth and final element, we hold that the Defendants' failure to dispose of the Township's funds as required is established by: (1) their deposit of the commencement check into MEM's corporate account; (2) their use of this account to pay themselves bonuses; (3) their failure to initiate timely contact with PPL; (4) their minimal feedback to the Township's executives; (5) their failure to pay PPL's initiation fee; (6) their inability to certify that MEM had sufficient funds to complete the transfer; and (7) their failure to complete the transfer.

Order, 10/15/2012, at 6-12 (some footnotes omitted). Further, in its Rule 1925(a) opinion, the court opined:

Our subsequent review of the [Pennsylvania] Supreme Court's decision [in] *Commonwealth v. Turrell*[, 584 A.2d 882 (Pa.

- 15 -

1990)[9]] further bolsters our conclusion. We submit that McLaine's position with respect to the purported escrow requirement for Theft is unsupported by Pennsylvania law.

…

[McLaine] asserts that the evidence establishes that Kearns was the only guilty party; that MEM made a partial disposition of the funds; and that he was "merely a shareholder" in MEM.

With respect to the evidence of McLaine's guilt, we note that it is undisputed that both Defendants signed the October 1, 2007 checks. McLaine received a disproportionate share of this disbursement, including one check for approximately $500,000. He also participated in the MEM business meeting where the

_____

[9] In *Turrell*, the defendant, an attorney, was charged with three counts of theft by failure to make required disposition of funds received. The charges stemmed from the defendant's use of escrow account funds for his own use and using other client's escrow funds to make disbursements. The trial court dismissed the charges, and a panel of this Court affirmed its decision. The Commonwealth appealed, and the Pennsylvania Supreme Court reversed in part, remanding as to two of the charges, but affirming as to the third charge. With respect to that third charge, the Supreme Court found there was a breach of the defendant's professional responsibilities, but no violation of the criminal statute. Specifically, the Court held:

[The] commingling of funds, although ethically reprehensible, does not in and of itself constitute a criminal violation of § 3927(a) of the Crimes Code. Instead, a criminal violation occurs when an attorney evinces an intent not to make the required payment or disposition. Until such time as payment is due, an attorney cannot be considered in violation of § 3927(a), although he very well may have violated the Rules of Professional Conduct. However, assuming all the other elements have been satisfied, once payment is required and an attorney fails to make such payment, then a violation of § 3927(a) has occurred.

*Turrell*, 584 A.2d at 886. The Court determined that with respect to the facts of the third charge, there was no present obligation to disburse the funds held.

- 16 -

checks were discussed and ratified. Unlike Kearn[s], McLaine did not leave MEM until September or October of 2011.

> With respect to partial performance, we acknowledge that MEM did present some evidence to this effect, for example, the $50,000 payment to Precision Electric. However, there is no evidence that MEM used Bethlehem Township's funds during this transaction. The jury could have concluded that MEM was simply "robbing from Peter to pay Paul."

> With respect to McLaine's assertion that he was only a "shareholder" in MEM, we note that the company just had two shareholders at the time. McLaine also received nearly $1 million in compensation from MEM in 2007. In addition, he was an active participant in MEM's business meetings and held the titles of Secretary and Treasurer.

Trial Court Opinion, 6/2/2014, at 35-37 (footnotes omitted). Our review of record reveals the exact same evidence was presented at trial and was sufficient for the jury to find beyond a reasonable doubt that McLaine committed the crime of theft. As such, we agree with the trial court's thorough analysis. Accordingly, we affirm on this basis. Therefore, McLaine's first argument fails.

Next, McLaine argues the verdict was against the weight of the evidence.[10] **See** McLaine's Brief at 35. He concisely states:

> The argument that the verdict was against the weight of the evidence closely follows that presented above in the sufficiency argument. Therefore, [McLaine] refers the Court to that analysis. Even if the Court were to find [] sufficient evidence, the verdict was against the weight of the evidence for reasons discussed above, specifically the uncontroverted

---

[10] McLaine properly preserved his challenge to the weight of the evidence by raising it in a post-sentence motion. **See** Pa.R.Crim.P. 607(A).

evidence of partial performance, the fact that Kearns, rather than [McLaine] was a party to all relevant transactions, and the fact that the specific funds of the Municipality cannot be traced to [McLaine]'s specific possession. Therefore, this Court should remand the case for a new trial.

*Id.* at 35.

Appellate review of a weight of the evidence claim is well-established:

A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. *Commonwealth v. Widmer*, 560 Pa. 308, 318–20, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Champney*, 574 Pa. 435, 443–44, 832 A.2d 403, 408–09 (2003). On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination. *Widmer*, 560 Pa. at 321–22, 744 A.2d at 753; *Champney*, 574 Pa. at 444, 832 A.2d at 408.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014).

Although the court noted McLaine did raise the weight issue in his concise statement, it did not address the weight in its analysis of McLaine's arguments but did address the issue with regard to Kearns, stating: "After a thorough review of the record, we are convinced that the question of criminal liability was for the jury. We only substitute our judgment for that of the jury in the most egregious cases. This case falls below that standard." Trial Court Opinion, 6/2/2014, at 40.

- 18 -

We agree with the court's rationale. Pursuant to the standard, and in conformity with our sufficiency analysis, the evidence in the present matter was not "so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." **Lyons**, 79 A.3d at 1067. As our Supreme Court has made clear, we may not reweigh the evidence and substitute our judgment for the trial court's decision. **See Lyons**, **supra**. Therefore, McLaine's weight claim fails.

With respect to McLaine's third argument, he asserts the trial court erred in admitting evidence of MEM's business dealings in other townships as prior bad acts because (1) those acts were not convictions, (2) they were not substantially related to the case at hand, and (3) they did not fall under an exception to the prohibition against the admission of prior bad acts. McLaine's Brief at 36. McLaine notes evidence of uncharged crimes and prior bad acts is not admissible at trial to demonstrate a defendant's propensity to commit the crime charged unless an exception to the rule applies. **Id.** He states the Commonwealth sought admission of the evidence, claiming the acts constitute an exception to the rule because they fall under a common scheme, plan, or design. **Id.** McLaine argues the exception does not apply to the facts of his case where: (1) there was no unity of location since the acts took place in different municipalities; (2) there was no unity of time because there were years separating all of the actions at issue; and (3) there was no *modus operandi* because each case involved different contracts

and different breaches following the formation of the contracts. *Id.* at 40. Moreover, he contends the Commonwealth stretches "the common plan, scheme, or design exception to its logical limits in an attempt to prove action in conformity with prior bad acts and to prove that [he] is a person of unsavory character." *Id.* Lastly, McLaine complains that the probative value of the evidence did not outweigh the prejudice as the introduction of this testimony "wrongfully blackened" his character in the mind of the jury. *Id.* at 42.

With respect to an admissibility of evidence claim, our standard of review is as follows:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Borovichka*, 18 A.3d 1242, 1253 (Pa. Super. 2011) (citation omitted).

The admission of evidence of prior bad acts or crimes is governed by Pennsylvania Rule of Evidence 404(b), which provides, in relevant part:

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1-2). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." ***Commonwealth v. Minerd***, 753 A.2d 225, 230 (Pa. 2000) (citations omitted). Evidence is prejudicial only when it is "so prejudicial that it may inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." ***Commonwealth v. Colon***, 846 A.2d 747, 753 (Pa. Super. 2004), (citation omitted), *appeal denied*, 870 A.2d 320 (Pa. 2005).

The court summarized the trial testimony at issue as follows:

*8. Michael Corriere*

Attorney Michael Corriere has been the solicitor for the Borough of Walnutport since 2002.

On July 30, 2009, Walnutport entered into a contract with MEM. The estimated cost was $192,000, with MEM to receive a 5% commission. Walnutport paid a commencement fee of $107,620. Corriere understood that the project would be complete by 2010, but that did not occur.

Nothing happened until October 2011. At that time, Borough Council authorized a second payment to MEM. Kearns assured Corriere that the deal was close to a conclusion and that the Borough would receive a rebate.

Nothing happened after the second payment. In January of 2012, Borough Council asked Corriere to contact Kearns for a status report. Kearns did not respond.

Corriere then contacted PPL and spoke with [Damon] Obie[, senior counsel for PPL]. Borough Council authorized him to determine whether it could complete the conversion without MEM. PPL provided a "ballpark estimate" of $53,000. To date, Walnutport does not own its streetlights.

MEM did not refund the commencement payments. It did reimburse Walnutport $7,500.

On cross-examination, Corriere conceded that he contacted PPL after learning that [the Commonwealth] had filed criminal charges against MEM. He acknowledged receipt of the July 13, 2010 memo.[11] Corriere never dealt with McLaine.

## 8. *Steven Seacrest*

Steven Seacrest has been the Richland Township Manager for 12 years. He oversees its day-to-day operations. On March 12, 2009, Richland Township entered into a contract with MEM. MEM provided a cost estimate of $281,000 and received a 5% commission.

Richland Township made commencement payments of $165,000. It borrowed money for the project, which was never completed.

---

[11] The July 13, 2010, memo was a document MEM provided to several municipalities, informing them that MEM had encountered problems with PPL and PPL's refusal to treat the new municipalities the way they treated the 11 successful prior transactions. *See* N.T., 1/9/2013, 98-99.

PPL informed Richland Township that MEM had not contacted PPL on its behalf. Richland Township had several meetings with Kearns, who invariably stated that MEM was having problems with PPL but moving the project forward.

To date, Richland Township does not own its streetlights. MEM did not refund the commencement fee.

On cross-examination, Seacrest conceded that MEM set up an online system for reporting lighting outages and trained Richland Township staff in its use. In addition, PPL did not offer to reduce Richland Township's tariff to the municipal-owned rate.

### 9. *Sandra Gyecsek*

Sandra Gyecsek is the Secretary and Treasurer for the Borough of Coplay. She handles its day-to-day operations, including accounts payable, accounts receivable, and payroll. Gyecsek has been with the Borough for 15 years.

In 2009, Coplay entered into an agreement with MEM. The total estimated cost was $291,700. MEM received a 5% commission of $14,585.

In June of 2009, Coplay paid MEM $160,182. It borrowed money for the project. Afterward, nothing happened.

In July of 2010, PPL informed Gyecsek that it had no record of MEM representing Coplay. Coplay then contacted PPL to determine if it could complete the project without MEM. In April of 2012, PPL provided a "ballpark estimate" of $83,120.

MEM did not transfer any money to PPL on Coplay's behalf or return the commencement fee. To date, Coplay does not own its streetlights. Gyecsek mainly dealt with Kearns and never met McLaine.

On cross-examination, Gyecsek acknowledged that Coplay's solicitor, Broughal & DeVito, had reviewed the contract before the Borough signed it. She conceded that she could not gauge the accuracy of PPL's "ballpark estimate."

Gyecsek confirmed that the Borough received the July 13, 2010 memo. PPL did not inform Coplay that it could only process one application at a time.

Trial Court Opinion, 6/2/2014, at 18-20.[12]

On January 7, 2013, the court entered an order, permitting admission of the proposed testimony, explaining that the Commonwealth's use of the Defendants' dealings with Coplay Borough, Richland Township, and Walnutport Borough was admissible to prove the Defendants' common scheme or plan. *See* Order, 1/7/2013, at 3. The court's order also permitted the Defendants to raise specific objections to the Commonwealth's Rule 404(b) evidence at trial. Subsequently, in its Rule 1925(a) opinion, the court also stated: "We further submit the [Rule] 404(b) evidence introduced at trial was proper because it tended to establish the Defendants' *modus operandi* of commingling funds, failing to deliver promised services, making repeated empty assurances, withdrawing from communication, and refusing to pay refunds." Trial Court Opinion, 6/2/2014, at 37.

In considering whether evidence is admissible under the common plan exception, we are guided by the following:

When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to

_____

[12] This evidence and issue was also discussed extensively prior to trial at the January 4, 2013, pre-trial hearing. *See* N.T., 1/4/2013, at 80-94.

become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

***Commonwealth v. G.D.M., Sr.***, 2007 PA Super 169, 926 A.2d 984, 987 (Pa. Super. 2007), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008) (*quoting* ***Commonwealth v. Smith***, 431 Pa. Super. 91, 635 A.2d 1086, 1089 (Pa. Super. 1993)).

Although "remoteness in time is a factor to be considered in determining the probative value of other crimes evidence under the theory of common scheme, plan or design, the importance of the time period is inversely proportional to the similarity of the crimes in question." ***Commonwealth v. Aikens***, 2010 PA Super 29, 990 A.2d 1181, 1185 (Pa. Super. 2010), *appeal denied*, 607 Pa. 694, 4 A.3d 157 (2010) (holding evidence of defendant's prior sexual assault was admissible under common scheme exception despite nearly ten-year gap between periods of abuse, where victims were of similar age and both were daughters of defendant; defendant initiated contact with each victim during overnight visit in his apartment; defendant began sexual abuse by showing victims pornographic movies; and assaults occurred in bed at night).

***Commonwealth v. Tyson***, 119 A.3d 353, 358-359 (Pa. Super. 2015).

Initially, we note defense counsel did not raise specific objections at trial to the admissibility of this evidence. Second, contrary to McLaine's suggestion that there were distinct differences in the prior bad acts with regard to this case, the record reveals the following factual similarities between the present case and the defendants' prior acts: (1) McLaine and Kearns entered into written contracts with municipalities for the transfer of streets lights from PPL to the municipalities; (2) the contracts contained substantially similar language, including MEM's performance in obtaining ownership of the street lights; (3) the contracts required the municipalities to make payments upfront to McLaine and Kearns for performance and the defendants would receive a 5% commission fee; (4) McLaine and Kearns either delayed or never contacted PPL to begin the streetlight process; (5) McLaine's and Kearns's proposed costs of transferring the lights to the municipalities substantially exceeded the actual amounts estimated by PPL; and (6) McLaine and Kearns failed to perform their obligation under the contracts. Therefore, despite McLaine's argument, we conclude that the trial court did not abuse its discretion in determining that the evidence of the prior bad acts satisfied the requirements of the common scheme, plan, or design exception, and the probative value of the evidence outweighed any prejudicial effect. Accordingly, this issue fails.

Next, McLaine asserts the trial court erred in quashing his subpoena for PPL records because they were relevant and necessary to the

presentation of a defense in his case. **See** McLaine's Brief at 44. By way of background, shortly before trial, on December 28, 2012, McLaine served a subpoena on PPL requesting records of its dealings with MEM, and the municipalities that were involved with MEM and PPL, regarding streetlight transactions. **See** N.T., 1/4/2013, at 104. Argument was heard regarding the subpoena on January 4, 2013. Counsel for PPL presented a motion to quash the subpoena, asserting the request "to produce involves approximately twenty-eight municipalities spanning from the years 2002 up until 2009" was "overly burdensome." **Id.** at 105. The court granted PPL's motion to quash the subpoena on January 7, 2013. **See** Order, 1/7/2013.

McLaine now argues: (1) this information was not available from another source; (2) PPL was the only other party to the transaction, other than MEM and the municipalities, and they had files that the other parties did not; and (3) the files were relevant and necessary to the defense because the entire defense focused on the actions taken by PPL, which frustrated the purposes of the contract and rendered MEM unable to perform. **Id.** at 44-45.

Generally, "the standard of review regarding a motion to quash a subpoena is whether the trial court abused its discretion." **Leber v. Stretton**, 928 A.2d 262, 266 (Pa. Super. 2007), *appeal denied*, 945 A.2d

172 (Pa. 2008).[13]   In its Rule 1925(a) opinion, the court concisely noted it did not abuse its discretion in sustaining this motion because "PPL could not possibly produce this information on the eve of trial."   Trial Court Opinion, 6/2/2014, at 37.

We agree with the trial court's finding.   McLaine waited until ten days before trial to serve the subpoena and requested **seven years** of records for numerous municipalities.   Moreover, as counsel for PPL suggests, some of the information requested was not relevant to the criminal matter at hand, there were many departments involved in the streetlight system that would have needed to be notified, and there was concern over attorney/client privilege.   *See* N.T., 1/4/2013, at 106, 113.   Likewise, PPL counsel points out McLaine received substantial discovery from the Commonwealth prior to trial that assisted in the presentation of his defense.   *Id.* at 114. Accordingly, we agree the trial court did not abuse its discretion in granting the belated motion and McLaine's claim is without merit.

In McLaine's fourth argument, he alleges the court erred in failing to grant a mistrial during the Commonwealth's closing argument when the district attorney made malicious and improper statements regarding McLaine.   *See* McLaine's Brief at 45.   McLaine states these comments were

---

[13]   *See also Commonwealth v. Niemetz*, 422 A.2d 1369, 1373 (Pa. Super. 1980) ("The decision to grant or deny a motion to quash is within the sound discretion of the trial judge and will be reversed on appeal only where there has been a clear abuse of discretion.").

inappropriate and served no purpose other than to inflame the jury against him. McLaine's Brief at 46.

McLaine points to the following statements:

1. In referring to the defendants' actions, "It's li[ke] a Ponzi Scheme."

2. "This statute which is passed by our legislature is to protect people who entrust money to other people for specific purposes. If you guys think this is a bad law, you could find them not guilty and say, you know, I don't think this is a good law.

    So next time you give $20,000 to the real estate agent to buy a house, and he says, I'm sorry, I can't get this house for you, he says, I can't get this house for you, he gets to keep[] it. Doesn't have to give it back. Oh, sue me. I'm bankrupt. Good luck."

3. "These guys are crooks in suits, ladies and gentlemen, in suits; not wearing a bandana over their face, suits and pencils and papers and computers and lawyers and accountants and lawyers."

N.T., 1/10/2013, at 203, 213-214, 218.

We are guided by the following:

> We review the trial court's decision to deny a mistrial for an abuse of discretion. A mistrial is necessary only when the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is inappropriate where cautionary instructions are sufficient to overcome any potential prejudice.

***Commonwealth v. Bedford***, 50 A.3d 707, 712-713 (Pa. Super. 2012) (citations and internal quotation marks omitted), *appeal denied*, 57 A.3d 65 (Pa. 2012).

Moreover,

[t]he legal principles relevant to a claim of prosecutorial misconduct are well established.

Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

***Commonwealth v. Hutchinson***, 611 Pa. 280, 25 A.3d 277, 307 (Pa. 2011) (citation omitted).

While it is improper for a prosecutor to offer any personal opinion as to the guilt of the defendant or the credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt. ***Id.*** at 306-07; ***Chamberlain***, ***supra*** at 408. In addition, the prosecutor must be allowed to respond to defense counsel's arguments, and any challenged statement must be viewed not in isolation, but in the context in which it was offered. ***Hutchinson***, ***supra*** at 307. "[The] prosecutor must be free to present his or her arguments with logical force and vigor," and comments representing mere oratorical flair are not objectionable. ***Id.*** at 306-07 (citation omitted).

***Commonwealth v. Thomas***, 54 A.3d 332, 337-338 (Pa. 2012), *cert. denied*, 134 S. Ct. 173 (U.S. 2013).

Here, the record reveals the following. At the end of the prosecutor's closing argument, counsel for McLaine objected to the statements at issue. N.T., 1/10/2013, at 223. In response to the first statement regarding the "Ponzi scheme," the court imparted a cautionary instruction to the jury. N.T., 1/11/2013, at 3, 8. Specifically, the court stated:

[T]here was a reference to the overall behavior of the Defendant as constituting a Ponzi Scheme. You've heard that

- 30 -

reference there. That is sort of a buzz word, but this case does not involve a Ponzi Scheme. That term is used to describe a fraudulent investment scheme where later investors generated artificially high dividends and higher dividends than the other investors.

So the District Attorney used that term in a slang context, but I don't want you to gravitate to the belief that this behavior is alleged in any way to be a Ponzi Scheme.

*Id.* at 8.

With respect to the second statement regarding the prosecutor's personal opinion, the court did not find "any support that he interjected his personal opinion in an improper way in his closing." *Id.* at 3. Lastly, with regard to the "crooks in suits" comment, the court determined it be a "slang," noting, "These Defendants are charged with thefts, and he's made it quite clear, the prosecution has made it clear, these are thefts. And he went to some length to define the various types of thefts in this matter … So I intend to tell the jury that the use of slang is -- it's not improperly inflammatory[.]" *Id.* at 4.

We are inclined to agree with the court's determinations. With respect to the cautionary instruction, the "law presumes that the jury will follow the instructions of the court." ***Commonwealth v. Miller***, 819 A.2d 504, 513 (Pa. 2002), *cert. denied*, 540 U.S. 827 (2003). Moreover, the "Commonwealth is entitled to comment during closing arguments on matters that might otherwise be objectionable or even outright misconduct, where such comments constitute fair response to matters raised by the defense, or

where they are merely responsive to actual evidence admitted during a trial." **Commonwealth v. Culver**, 51 A.3d 866, 876 (Pa. Super. 2012). Viewing the prosecutor's comments in context, they were in response to matters raised by the defense as to whether the defendants actually committed a theft. Therefore, we conclude the prosecutor's remarks during closing arguments did not so prejudice the jury that they could not weigh the evidence objectively. Accordingly, we find the court did not abuse its discretion in denying McLaine's motion for a mistrial, and his fourth argument fails. **See Hutchinson**, 25 A.3d at 307.

In his penultimate issue, McLaine argues the trial court failed to suppress his July 26, 2011, civil deposition testimony because the Solicitor of Bethlehem Township, John Harrison, who conducted the deposition, was acting in concert with the prosecuting attorney and no **Miranda** warnings were provided. McLaine's Brief at 47. McLaine notes that pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself,"[14] and that this privilege applies at all stages of a criminal proceeding. **Id.** He states he "was compelled to make statements at a civil deposition at a time when criminal prosecution was contemplated by the District Attorney and the Solicitor deposing [McLaine] and when [McLaine] had no idea that such

---

[14] U.S. CONST. AMEND. V.

prosecution was pending." *Id.* Moreover, he alleges he "was not warned of

his right against self-incrimination; therefore, his statements should have

been suppressed." *Id.*

When reviewing an order denying a pre-trial motion to suppress

evidence, we are guided by the following:

> We are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We may consider the evidence of the witnesses offered by the prosecution, as verdict winner, and only so much of the defense evidence that remains uncontradicted as a whole. We are bound by facts supported by the record and may reverse only if the legal conclusions reached by the court below were erroneous.

*Borovichka*, 18 A.3d at 1248-1249. Additionally,

> [a]ssuming that there is support in the record for the suppression court's factual findings -- and there is no dispute here on the governing facts -- we are bound by those facts and we may reverse only if the legal conclusions drawn from those facts are in error. If there is sufficient evidence of record to support the suppression court's ruling and the court has not misapplied the law, we will not substitute our credibility determinations for those of the suppression court judge. However, if the court has misapplied the law, we must reverse that court's determination.

*Commonwealth v. Johnson*, 86 A.3d 182, 187 (Pa. 2014) (citations

omitted).

Turing to one's right against self-incrimination, we are guided by the

following:

> The Fifth Amendment provides "no person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. This prohibition not only permits an individual to refuse to testify against himself when he is a defendant but

- 33 -

also "'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" [***Minnesota v. Murphy***, 465 U.S. 420, 426 (1984)] (*quoting* ***Lefkowitz v. Turley***, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973)). The Fifth Amendment privilege against self-incrimination is generally not self-executing, and ordinarily an individual must assert the privilege for subsequent statements to be considered "compelled" within the meaning of the Fifth Amendment. ***Murphy***, at 427; [***Commonwealth v. Knoble***, 42 A.3d 976, 979 (Pa. 2012)]. However, the Fifth Amendment is self-executing where an individual is subject to custodial interrogation without being given ***Miranda*** warnings. ***Murphy***, at 429-30; ***Miranda***, at 467-69.

***Commonwealth v. Cooley****, 118 A.3d 370, 375-376 (Pa. 2015) (footnotes omitted).

By way of background, on December 19, 2012, McLaine filed a motion to suppress, stating: "On July 26, 2011, [McLaine] was deposed on a purely civil matter by Bethlehem Township Solicitor John Harrison in the matter of Bethlehem Township v. Municipal Energy Managers, docketed at 10 CV 4171." McLaine's Supplemental Omnibus Pretrial Motion, 12/19/2012, at 1. Furthermore, he alleged that prior to this deposition, Harrison met with the District Attorney in the present matter and McLaine believed "that at this meeting, [the prosecutor] and Harrison discussed the civil case against Municipal Energy Managers as it related to a contemplated criminal prosecution against [McLaine]." ***Id.*** at 2. Additionally, he averred that after he was deposed and made inculpatory statements, those transcripts were provided to the prosecutor for use in the present criminal matter. ***Id.*** at 2.

At the January 4, 2013, pretrial hearing, the prosecutor responded to

McLaine's argument, stating:

> Your Honor, Exhibit 2 is a letter dated June 2nd, 2011. And the letter is from the lawyer Patrick Casey. In this case the defendant is alleging that -- the defendant is alleging that at the time he went for depositions in July of 2011, as he says here, that he was not informed of the contemplated criminal prosecution. That's absolutely untrue.
>
> It's untrue because well before July of 2011, when these depositions were taken, I personally had spoken to their civil trial lawyer from MEM, Mr. Shoemaker. Mr. Shoemaker advised me that he was not a criminal lawyer. I told Mr. Shoemaker that we were looking into this matter. This is back in March of 2011, months before this deposition in July.
>
> I told him that we were preliminarily looking into the matter. And I wanted to talk to Mr. Shoemaker, who was the counsel of record in the civil case. Mr. Shoemaker advised I do not do criminal work, but I'll have two lawyers get in touch with you.
>
> …
>
> So what happened, Judge, is after the initial contact was made by my office to Attorney Shoemaker, who is a civil lawyer for MEM, he referred us to Mr. Cognetti and Mr. Casey.
>
> As you can see from the letter he alluded to, thank you for giving us your time on Thursday, June 2nd, to discuss the issues. Cognetti representing -- Sal Cognetti representing Mr. McLaine and Mr. Casey representing Mr. Kearns, as set forth in this letter, met with me and we were informed they were -- and they were informed that our office was looking into this case.
>
> So for them to claim in this petition there was no evidence of any contemplated criminal matter pending, when they went in July, I would point out that Sal Cognetti was the lawyer who sat with his client at the deposition. Mr. Cognetti, who met with me and knew that the District Attorney was looking into this matter, he is the lawyer at the deposition sitting next to his client giving

the deposition. He knew in July of 2011. He met with me, here's the letter.

Mr. Casey acknowledged that he had met with me already.

N.T., 1/4/2013, at 27-29.

Furthermore, at the pre-trial hearing, McLaine admitted on cross-examination that: (1) his previous attorney, Shoemaker, had told him that the prosecutor had been in contact with the attorney; (2) he had discussion with his other prior counsel, Cognetti, regarding the matter; and (3) when he was deposed in July of 2011, he was aware the District Attorney's Office was investigating the matter. *Id.* at 60-61. Nevertheless, McLaine testified he was not under the impression that criminal charges would be forthcoming but "that if we could solve the problem, in other words convert Bethlehem Township, there would be no filings." *Id.* at 62-63.

Based on the evidence, the court found the following:

> The Defendants' Motion to Suppress all statements made during their depositions in July of 2011, on the ground that Bethlehem Township Solicitor John Harrison was acting as an agent of the Commonwealth in conducting the depositions, is **DENIED**. The Court finds insufficient evidence of bad faith on the part of the Commonwealth to justify this extreme remedy. *See U.S. v. Rand*, 308 F. Supp. 1231 (D.C. Ohio 1970). Specifically, the Court finds that: (a) the Defendants had actual knowledge of the Commonwealth's potential interest in initiating a criminal action; and (b) the Defendants failed to produce sufficient evidence of collaboration between the District Attorney and Attorney Harrison prior to the depositions.

Order, 1/7/2013, at 2 (emphasis in original).

We agree with the court's findings as the record supports its conclusion. The prosecutor had informed McLaine's attorney prior to the civil deposition date that there was potential for a criminal investigation. Moreover, McLaine, himself, admitted that he was aware of the possible criminal matter. Additionally, as noted above, the Fifth Amendment privilege is generally not self-executing and therefore, McLaine would have had to invoke it. **See Cooley**, **supra**. Lastly, McLaine did not present any evidence, besides mere allegations, that the prosecutor acted in bad faith or collaborated with Harrison prior to the deposition.[15] Accordingly, this argument is without merit.

---

[15] We note McLaine relies on a federal district court case, **United States v. Guerrina**, 112 F. Supp. 126 (E.D. Pa. 1953), to support his argument. In **Guerrina**, the defendant was cooperating with an Internal Revenue employee to examine files for the purpose of an audit. That employee brought another individual, whose identity was not made known to the defendant, but who subsequently turned out be a special agent for the Intelligence Unit of the Internal Revenue Bureau. "The special agent was there in connection with an investigation of the defendant for possible criminal action for filing false and fraudulent returns, which fact was never made known to the defendant during the course of the examination." **Id.** at 128. In granting the motion to suppress, the federal district court stated:

> To permit evidence to be obtained against a defendant by the means here employed (however innocently it may have been done in this case) would be to encourage overzealous and less scrupulous officers and agents of law enforcement agencies to chip away rights guaranteed by the Constitution to defendants by trick and artifice, to do what could not be done in court proceedings, *i.e.*, compel a defendant to testify against himself.

*(Footnote Continued Next Page)*

Lastly, McLaine contends the court imposed an illegal sentence. He points out that the maximum penalty for theft by failure to make required disposition of funds, a third-degree misdemeanor, is one year of incarceration, and his sentence is six to 12 months' plus one year of consecutive probation. McLaine's Brief at 21. He states "the aggregate two-year sentence exceeds the one-year maximum prescribed by statute." *Id.*

Our standard of review is as follows.

A challenge to the legality of a sentence may be raised as a matter of right, is not subject to waiver, and may be entertained as long as the reviewing court has jurisdiction. If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. We can raise and review an illegal sentence *sua sponte.* When we address the legality of a sentence, our

*(Footnote Continued)* ———————

*Id.* at 130. We find **Guerrina** distinguishable from the present matter because, as stated above, McLaine was aware **prior to the deposition** about the prosecutor's investigation and he did not establish the prosecutor acted in collaboration with Harrison in conducting the civil deposition.

Moreover, McLaine's reliance on **United States v. Rand**, 308 F. Supp. 1231 (N.D. Ohio 1970), is misplaced. In **Rand**, the defendants' indictment followed a civil action brought by the Food and Drug Administration (FDA) against them. One of the defendants, the president of the company, asserted his Fifth Amendment right against self-incrimination was violated because he cooperated with the government's initial investigation and subsequently took the stand in his defense based upon the promise of immunity. The court determined that while the FDA proceeding was not for the purpose of evidence-gathering, the government was improperly engaged in using a parallel proceeding for criminal prosecution. The court found suppression was the appropriate relief because the United States attorney and the civil court allegedly told defense counsel that no criminal prosecution would ensue, and defendants were entitled to rely upon that promise. **See Rand**, *supra*. Here, McLaine received no promise of immunity.

standard of review is plenary and is limited to determining whether the trial court erred as a matter of law.

***Borovichka***, 18 A.3d at 1254 n.8 (internal citations and quotation marks omitted).

As noted above, McLaine's theft crime was originally graded as a third-degree felony but on June 4, 2013, the court re-sentenced McLaine, grading it as a third-degree misdemeanor, and ordered him to serve a term of six to 12 months' incarceration, plus 60 months of probation. Subsequently, on July 31, 2013, the trial court entered an order, modifying the sentence to a consecutive period of probation of 12 months rather than 60 months. The remainder of the sentence was not changed.[16]

"A crime is a misdemeanor of the third degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than one year." 18 Pa.C.S. § 106(b)(8). Here, McLaine's 12-month probationary period exceeded the one-year limit. ***See Commonwealth v. Lee***, 947 A.2d 199 (Pa. Super. 2008) (finding the length of the four-year sentence was illegal, in that, although the offense was graded as a first degree misdemeanor, 18 Pa.C.S. § 5511(a)(2.1)(ii) provided for a maximum term of imprisonment of

---

[16] We note this panel affirmed the grading of McLaine's offense as a third-degree misdemeanor in the disposition of the Commonwealth's appeal at Docket No. 1685 EDA 2013.

two years), *appeal denied*, 981 A.2d 218 (Pa. 2009).[17]  Accordingly, we are constrained to vacate the judgment of sentence and remand this matter for re-sentencing as to the length of the probationary period.

Judgment of sentence vacated.   Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2015

---

[17]  The trial court deferred to this Court on the issue.  **See** Trial Court Opinion, 6/2/2014, at 34.